ACLU OF HAWAII FOUNDATION

JONGWOOK "WOOKIE" KIM  #11020
P.O. Box 3410
Honolulu, Hawaii 96801
Telephone:  (808) 522-5905
E-mail:      wkim@acluhawaii.org

Attorney for Plaintiff
ROBIN HALL

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ROBIN HALL<br><br>                    Plaintiff,<br><br>        vs.<br><br>CITY AND COUNTY OF HONOLULU; CHRISTOPHER KOANUI; LEONARD LETOTO; DEBRA MAIOHO-POHINA; DOE OFFICER 1; DOE OFFICER 2; and DOE OFFICER 3<br><br>                    Defendants. | CIVIL NO. _____<br><br>[CIVIL RIGHTS ACTION]<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES; DEMAND FOR JURY TRIAL** |

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

PARTIES ...........................................................................................................5

JURISDICTION ................................................................................................7

FACTUAL ALLEGATIONS ...........................................................................8

   A.   Defendant Officer Koanui's Close Friend and Business Partner, Defendant Leonard Letoto, Attacks Plaintiff at Her Residence ...............................................8

   B.   Defendant Officer Koanui Unconstitutionally and Maliciously Abuses His Authority as a Law Enforcement Officer to Protect His and His Business Partner's Personal Interests .................................................................................11

      1.   Defendant Officer Koanui Improperly Intercepts Plaintiff's 911 Call ......11

      2.   Defendant Officer Koanui Refuses to File a Police Report from Plaintiff Against His Friend and Business Partner, Defendant Letoto ...........................12

      3.   Defendant Officer Koanui Retaliates Against Plaintiff by Arresting Her, Filing a False and Misleading Police Report Against Her on Defendant Letoto's Behalf, and Intimidating and Harassing Her by Threatening to Arrest Her in the Future...............................................................................................14

   C.   Plaintiff Seeks Redress Through Internal Police Department Mechanisms, to No Avail.......................................................................................................17

   D.   Defendant City and County of Honolulu Violates—and Shows Deliberate Indifference to—Plaintiff's Constitutional Rights .............................................19

      1.   Defendant City Has a De Facto Policy or Custom of Permitting HPD Officers' Selective Enforcement of the Law and Abuse of Law Enforcement Power To Further Personal and Private Interests ...........................................20

      2.   Defendant City Fails to Train, Supervise, and Discipline in a Manner Amounting to Deliberate Indifference to Plaintiff's Constitutional Rights .....26

      3.   An HPD Official With Final Policy-Making Authority for Defendant City Ratifies Defendant Officers' Unconstitutional Conduct ..................................30

   E.   Defendant City and Defendant HPD Officers' Conduct Causes Harm to Plaintiff...........................................................................................................34

CLAIMS FOR RELIEF ................................................................. 35

Claim 1: Violation of First Amendment Right to Petition the Government for Redress of Grievances, 42 U.S.C. Section 1983 (Against Officer Koanui and Doe Officer 1) ........................................................................ 35

Claim 2: First Amendment Retaliation, 42 U.S.C. § 1983 (Against Officer Koanui and Doe Officer 1) .................................................................. 37

Claim 3: Fourth Amendment False Arrest/Imprisonment, 42 U.S.C. § 1983 (Against Officer Koanui and Doe Officer 1) ........................................ 39

Claim 4: Fourteenth Amendment Malicious Abuse of Process, 42 U.S.C. § 1983 (Against Officer Koanui, Sergeant Maioho-Pohina, Doe Officer 1, Doe Officer 2, and Doe Officer 3) ................................................................. 40

Claim 5: Violation of Fourteenth Amendment Equal Protection, 42 U.S.C. § 1983 (Against Officer Koanui, Sergeant Maioho-Pohina, Doe Officer 1, Doe Officer 2, and Doe Officer 3) ........................................................... 41

Claim 6: Conspiracy to Interfere with Civil Rights, 42 U.S.C. § 1983 (Against Defendants Officer Koanui and Letoto) ................................................ 42

Claim 7: Supervisory Liability, 42 U.S.C. § 1983 (Against Sergeant Maioho-Pohina and Doe Officer 2) ................................................................... 43

Claim 8: *Monell* Liability for Policy or Custom, 42 U.S.C. § 1983 (Against City and County of Honolulu) ........................................................... 45

Claim 9: *Monell* Liability for Failure to Train, Supervise, and Discipline, 42 U.S.C. § 1983 (Against City and County of Honolulu) ........................ 46

Claim 10: *Monell* Liability for Ratification of Unconstitutional Conduct, 42 U.S.C. § 1983 (Against City and County of Honolulu) ........................ 48

Claim 11: Intentional Infliction of Emotional Distress (Against Officer Koanui and Letoto) ................................................................................ 49

Claim 12: Civil Conspiracy (Against Officer Koanui and Letoto) ................... 50

Claim 13: Assault and Battery (Against Letoto) ........................................ 50

PRAYER FOR RELIEF ............................................................... 51

## **INTRODUCTION**

1.      This case concerns two problems: First, the unconstitutional arrest and silencing of an innocent crime victim, and the retaliation against the victim's exercise of her First Amendment rights by the Honolulu Police Department ("HPD") during a June 10, 2019 incident that presented egregious conflicts of interest for the primary officer involved. Second, the ongoing disregard and deliberate indifference that the City and County of Honolulu ("City")—through its police department—has shown to Plaintiff's (and others') constitutional rights.

2.      On June 10, 2019, Plaintiff Robin Hall desperately called the City's 911 line to report that her boss, Defendant Leonard Letoto, had come to her residence, had assaulted her, and was attempting to force his way into the home. Ms. Hall feared for her safety and the safety of her family, and sought help from authorities who she thought could and would protect them.

3.      Defendant Christopher Koanui—an HPD officer—responded to the scene. Importantly, however—and unbeknownst to Ms. Hall—Officer Koanui and Mr. Letoto (*i.e.*, the criminal suspect) were in fact *close friends and business partners*. Specifically, Officer Koanui and Mr. Letoto were (and to this day, are) co-owners of the business for which Ms. Hall was working.

4.      Presented with such clear conflicts of interest, Officer Koanui abused his power to protect both his business and his close friend and business partner—

1

all at the expense of Ms. Hall. Upon arriving, Officer Koanui—ignoring his conflicts of interest—refused to file Ms. Hall's police report against Mr. Letoto despite her pleas. He then opened a false and misleading criminal report against Ms. Hall—arresting her in the process—and threatened to arrest and book her in the future if she persisted in trying to report his business partner's crimes to police.

5.      Through this conduct, Officer Koanui clearly violated Ms. Hall's constitutional rights in myriad ways. In refusing to file Ms. Hall's police report against Mr. Letoto despite her request, Officer Koanui violated her First Amendment right to petition the government for the redress of grievances. Then, in opening a false and misleading report against her, Officer Koanui unlawfully and maliciously abused the criminal legal process, and also directly infringed, and retaliated against the exercise of, Ms. Hall's First Amendment rights. Through his conduct, Officer Koanui also arrested Ms. Hall without valid justification in violation of the Fourth Amendment. Finally, by consciously choosing to open a false and misleading report on Mr. Letoto's behalf while at the same time refusing to take down a valid report from Ms. Hall, Officer Koanui violated Ms. Hall's Fourteenth Amendment equal protection rights.

6.      Ms. Hall suffered physical and psychological harms by this abuse of power. The bodily injuries Ms. Hall sustained from Mr. Letoto's conduct—requiring an ER visit and causing a limp—were serious enough. But the

psychological harms caused by Officer Koanui—the very person whom Ms. Hall believed would protect her and her family from Mr. Letoto's assault—also continue to haunt and traumatize her to this day. And for the almost two years since the incident occurred, the knowledge that a criminal theft investigation against her is pending has loomed over Plaintiff, causing serious psychological distress, and also causing her to refrain from applying to desired job opportunities with the government, which require thorough criminal background checks.

7.     And it is more than just Officer Koanui and Mr. Letoto who harmed Ms. Hall. In at least three ways, the *City* itself violated, and showed deliberate indifference towards, Plaintiff's constitutional rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution.

8.     First, the City had—and continues to have—a policy or custom permitting the very kind of abuse that Plaintiff suffered. Specifically, the City had and continues to have a de facto policy or custom of permitting HPD officers' selective enforcement of the law and abuse of law enforcement power to further personal and private interests. And it was precisely this policy or custom that caused the violations of Plaintiff's constitutional rights on June 10, 2019.

9.     Second, the City has failed to train, supervise, or discipline HPD officers regarding the very kind of violations that Plaintiff suffered, and those failures caused the deprivation of Plaintiff's constitutional rights here.

10.     Third, when presented with plausible allegations that Officer Koanui (among others) had engaged in unconstitutional and improper conduct, the City, through its official policymakers, made a deliberate choice from among various alternatives to endorse, approve, and ratify Officer Koanui's unconstitutional conduct. In essence, instead of acknowledging and addressing the serious misconduct that had harmed Ms. Hall, the City did nothing to rectify the problem.

11.     Ms. Hall now seeks redress from Officer Koanui and Mr. Letoto, as well as the other HPD officers and defendants who conspired with, assisted, encouraged, and permitted Koanui and Letoto to frame Ms. Hall, who on June 10, 2019 was simply an innocent crime victim attempting to solicit police aid in preventing her assailant from continuing to harm her.

12.     Ms. Hall also seeks to put an end to the City's—and specifically HPD's—deliberate indifference towards her (and others') constitutional rights by obtaining from this Court declaratory and permanent injunctive relief requiring the City to, among other things, implement policies, practices, procedures, trainings, and other measures to detect, identify, document, report, manage, and prevent conflicts of interest in policing, as well as adequate procedures to impose disciplinary action when such policies are violated.

## PARTIES

13.    Plaintiff ROBIN HALL ("Plaintiff" or "Hall") is and has been a resident of the City and County of Honolulu, State of Hawai'i at all relevant times.

14.    Defendant CITY AND COUNTY OF HONOLULU ("City") is and has been a duly organized municipal corporation of the State of Hawai'i at all relevant times. The Honolulu Police Department ("HPD") is a department and agency of the City.

15.    Defendant CHRISTOPHER KOANUI ("Officer Koanui") is and has been a citizen and resident of the City and County of Honolulu, State of Hawai'i, and has been employed as a police officer by the Honolulu Police Department at all relevant times. Defendant Officer Koanui is, and at all relevant times has been, a co-owner and/or member of "Exceptional Obedience, LLC" ("Exceptional Obedience"), a business entity that, at all relevant times, has held itself out as a duly organized limited liability company in the State of Hawai'i. Exceptional Obedience was administratively terminated by the State of Hawai'i on or about June 1, 2018.

16.    Defendant LEONARD LETOTO ("Letoto") is and has been a citizen and resident of the City and County of Honolulu, State of Hawai'i at all times pertinent hereto. Defendant Letoto is, and at all relevant times has been, a co-owner and/or member of Exceptional Obedience.

17.     Defendant DEBRA MAIOHO-POHINA ("Sergeant Maioho-Pohina") is and has been a citizen and resident of the City and County of Honolulu, State of Hawaiʻi, and has been employed as a police officer, with the rank of Sergeant, by the Honolulu Police Department at all relevant times.

18.     DOE OFFICERS 1-3 (collectively, "Doe Officers") are individuals whose true identities and capacities are currently unknown to Plaintiff and her counsel, despite diligent inquiry and investigation, and who acted as described more particularly below in connection with the breaches of duties and/or violations of law alleged here and who in some manner or form not currently discovered or known to Plaintiff may have contributed to or be responsible for the injuries alleged here. The true names and capacities of Doe Officers will be substituted as they become known.

19.     Upon information and belief, DOE OFFICER 1 ("Doe Officer 1") is and has been a citizen and resident of the City and County of Honolulu, State of Hawaiʻi, and has been employed as a police officer by the Honolulu Police Department at all relevant times. Upon information and belief, Doe Officer 1 accompanied Officer Koanui to the scene during the incident described here.

20.     Upon information and belief, DOE OFFICER 2 ("Doe Officer 2") is and has been a citizen and resident of the City and County of Honolulu, State of Hawaiʻi, and has been employed as a police officer by the Honolulu Police

Department at all relevant times. Upon information and belief, Doe Officer 2 is an HPD Sergeant who spoke to Hall about the incident at the Kapolei police station after the incident occurred.

21.    Upon information and belief, DOE OFFICER 3 ("Doe Officer 3") is and has been a citizen and resident of the City and County of Honolulu, State of Hawaiʻi, and has been employed as a police officer by the Honolulu Police Department at all relevant times. Upon information and belief, Doe Officer 3 is the HPD officer and/or detective who was assigned to investigate the theft report opened against Plaintiff on June 10, 2019.

## JURISDICTION

22.    This action arises under the Constitution and laws of the United States of America and the State of Hawaiʻi and is brought under 42 U.S.C. § 1983.

23.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiff's claims arise under the U.S. Constitution and federal law. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over related state law claims because they arise from the same case or controversy that gives rise to Plaintiff's federal law claims.

24.    Jurisdiction supporting Plaintiff's claims for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

25.     Venue is proper in the United States District Court for the District of Hawaii under 28 U.S.C. §§ 1391(a) and 1391(b) because all Defendants are located in this District, and all of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Defendant Officer Koanui's Close Friend and Business Partner, Defendant Leonard Letoto, Attacks Plaintiff at Her Residence

26.     Plaintiff is a mother of four children and a mental health professional who lives in West Oahu.

27.     For about six weeks between April and June of 2019, Plaintiff worked entirely remotely as a virtual administrative assistant for Exceptional Obedience, a dog-training business.

28.     Exceptional Obedience was—and still is—co-owned and operated by Defendants Officer Koanui and Letoto. Upon information and belief, Koanui and Letoto also were, and still are, close friends.

29.     During the course of her employment, Plaintiff interacted and worked exclusively with Defendant Letoto. Plaintiff never met or spoke with Defendant Officer Koanui before June 10, 2019.

30.     In June 2019, Plaintiff decided to resign from her position. She informed Defendant Letoto of her intention to end her employment with Exceptional Obedience. Defendant Letoto accepted her resignation.

8

31.     Plaintiff told Defendant Letoto to meet her at 92-1234 Umena Street, Kapolei, HI 96707 on June 10, 2019. Letoto agreed to arrive with cash to compensate Plaintiff for the work she had performed, and Plaintiff stated that he could retrieve the phone he had provided her to use for business purposes.

32.     At around 3:30pm on June 10, 2019, Defendant Letoto arrived at the residential home located at 92-1234 Umena Street, Kapolei, HI 96707. Plaintiff answered the door and the two began speaking while standing in the doorway.

33.     Instead of bringing cash as they had previously agreed, Defendant Letoto had brought a check. The two had a brief disagreement about the form of payment, but Plaintiff eventually took the check and stated that she would meet Defendant Letoto at the bank. It was her understanding that the two of them would go cash the check together to ensure that the check cleared.

34.     Defendant Letoto agreed to meet Plaintiff at the bank, and Plaintiff began to shut the front door. Defendant Letoto began to turn around and walk away from the house.

35.     Suddenly, Defendant Letoto flipped around and moved towards the front door. He grabbed the door handle, pressed down on the thumb piece to open it, and rammed his shoulder and knee into the door, trying to push his way inside. Defendant Letoto knew Plaintiff was still immediately on the other side of the

9

door, yet Defendant Letoto persisted in putting his full body weight into the door, which slammed the door into Plaintiff's body, injuring her as a result.

36.     Defendant Letoto continued to try to force his way in and shoved his foot between the door and the frame to keep it wedged open. Plaintiff screamed. Her son heard her screaming and rushed over to help barricade the door from inside the house. After some time, Defendant Letoto removed his foot, and Plaintiff and her son were able to close the door.

37.     At some point during the encounter, Plaintiff called 911 emergency services to report a crime in progress. She stated to an HPD dispatcher that her boss had broken into her residence and hurt her, and that he was still outside. The dispatcher said HPD would send someone immediately.

38.     While Plaintiff was waiting for emergency services to arrive, Defendant Letoto moved his van so that it completely blocked off the driveway entrance to the residence, effectively trapping Plaintiff and her son inside the property.

39.     Letoto's actions directly caused Plaintiff serious physical and psychological harm, including but not limited to a hip injury and a limp that required an ER visit and an assessment by an ambulance team on-scene. At the scene of the incident Plaintiff also experienced heart palpitations that caused her to

feel faint. Plaintiff has experienced severe emotional and mental trauma as a result of Letoto's actions as well.

**B.    Defendant Officer Koanui Unconstitutionally and Maliciously Abuses His Authority as a Law Enforcement Officer to Protect His and His Business Partner's Personal Interests**

40.    As described below, Defendant Officer Koanui unconstitutionally and maliciously abused his authority as a law enforcement officer by (1) improperly intercepting Plaintiff's 911 call despite the unambiguous conflicts of interest presented by the situation, (2) refusing to file a police report from Plaintiff against Defendant Letoto, and (3) retaliating against Plaintiff by arresting her, filing a false and misleading police report against Plaintiff for theft, and intimidating and harassing Plaintiff by threatening to arrest her again and book her in the future if she persisted in pursuing her grievances against Defendant Letoto.

**1.    Defendant Officer Koanui Improperly Intercepts Plaintiff's 911 Call**

41.    When Plaintiff began calling 911, Defendant Letoto knew that Plaintiff was calling 911 to report his ongoing criminal activity.

42.    Almost immediately after Plaintiff began calling 911 from inside the home, Plaintiff observed Defendant Letoto place a call on his cell phone outside and witnessed him speaking to someone on the phone.

43.    Upon information and belief, Defendant Letoto was in fact calling Defendant Officer Koanui to alert him about the ongoing 911 call, request that he

intervene by responding to the dispatch, and otherwise enlist his help in preventing Plaintiff from successfully filing a police complaint against Defendant Letoto.

44.     Upon information and belief, Defendant Officer Koanui was on duty in his capacity as a police officer at the time that Defendant Letoto broke into the residence at 92-1234 Umena St. and injured her.

45.     Upon information and belief, at the time of the incident, Defendant Officer Koanui was in Ewa Beach, over a twenty-minute drive away from the residence.

46.     Upon information and belief, the 911 operator sent out a dispatch in the area.

47.     Upon information and belief, Defendant Koanui, relying on the information provided by Defendant Letoto, improperly intervened and responded to the dispatch call.

48.     Officer Koanui responded to the dispatch call despite his knowledge that the incident involved a clear conflict of interest that would seriously impair his ability to perform his duties impartially.

### 2. Defendant Officer Koanui Refuses to File a Police Report from Plaintiff Against His Friend and Business Partner, Defendant Letoto

49.     Approximately twenty minutes after Plaintiff called 911, Defendant Officer Koanui arrived at the scene of the crime with Defendant Doe Officer 1.

50.     At some point while Defendants Officer Koanui and Doe Officer 1 were still on the scene, an ambulance arrived and evaluated Plaintiff's injuries.

51.     Defendants Officer Koanui and Doe Officer 1 arrived in uniform and were acting in their official capacities as police officers when they reported to the scene of the crime.

52.     Upon information and belief, Defendants Officer Koanui and Doe Officer 1, they proceeded directly to the house to speak with Plaintiff.

53.     After he arrived, Defendant Officer Koanui entered the residence to speak with Plaintiff. Although Defendant Doe Officer 1 originally entered the residence with Defendant Officer Koanui, Doe Officer 1 soon exited and waited outside the home for a substantial portion of the conversation. As a result, Plaintiff did not personally speak with Doe Officer 1 about the incident.

54.     During their conversation, Defendant Officer Koanui never identified himself to Plaintiff as the co-owner of Exceptional Obedience. He did not inform Plaintiff that he was, in fact, her other employer and boss at the business, or that he had both personal and business relationships with Defendant Letoto.

55.     Plaintiff also did not recognize Defendant Officer Koanui, as she had never met or spoken with him before, having only worked directly with Defendant Letoto.

56.     Plaintiff showed Defendant Officer Koanui her injuries and explained

that Defendant Letoto had broken into the residence and assaulted her by slamming

the door into her body.

57.     Plaintiff told Defendant Officer Koanui that she wanted to file a

police report against Defendant Letoto for breaking and entering, for assault, and

for false imprisonment. This was a valid attempt to exercise her First Amendment

right to petition the government for redress.

58.     However—despite the clear evidence of the harm to Plaintiff, and the

availability of multiple witnesses (including her minor son, K.H.)—Defendant

Koanui refused to take down a report from Plaintiff against his business partner,

Defendant Letoto, thus violating Plaintiff's First Amendment rights.

### 3.  Defendant Officer Koanui Retaliates Against Plaintiff by Arresting Her, Filing a False and Misleading Police Report Against Her on Defendant Letoto's Behalf, and Intimidating and Harassing Her by Threatening to Arrest Her in the Future

59.     To Plaintiff's surprise, instead of filing a report against Defendant

Letoto, Defendant Officer Koanui retaliated against Plaintiff for trying to exercise

her First Amendment rights by writing up a false and misleading report claiming

that Plaintiff had stolen the phone that Defendant Letoto had given her for work

purposes.

60.     HPD Policy Number 2.21 prohibits HPD officers from "knowingly

falsify[ing] (either orally or in writing) official reports or enter[ing] or caus[ing] to

14

be entered (either orally or in writing) any inaccurate, false or improper

information on any records of the department."

61.     Upon information and belief, Defendant Officer Koanui knowingly

and maliciously provided false, inaccurate, and/or misleading and incomplete

information on his official report in violation of HPD Policy Number 2.21.

62.     Defendant Officer Koanui filed the report without conducting a

genuine investigation, and without any legitimate probable cause. Upon

information and belief, the information Defendant Officer Koanui relied on

regarding the alleged theft came exclusively from Defendant Letoto—a source

tainted by multiple conflicts of interest.

63.     In the process of writing up this false report without legitimate

probable cause, Defendant Officer Koanui also arrested Plaintiff. Specifically, in

detaining and interrogating Plaintiff within the residence, Defendant Officer

Koanui's statements and conduct restrained Plaintiff's liberty such that Plaintiff

was not—and did not reasonably feel—free to leave. Confined to a small space in

the home, Defendant Officer Koanui assumed an authoritative, open-legged stance,

stood over Plaintiff while she sat on the couch, and questioned her in an

intimidating, accusatory manner. In the meantime, Defendant Letoto's van

continued to block the exit to her property.

64.     While Plaintiff was under arrest, Plaintiff explained to Defendant Officer Koanui that this allegation was entirely false and that she had not been withholding the work phone. She then attempted to return the phone by giving it to Defendant Officer Koanui, but he refused to take it. Eventually another witness on the scene helped Plaintiff, who was too shaken up and injured to confront Defendant Letoto again, by taking the phone outside and giving it to Letoto.

65.     When Plaintiff continued to request that Defendant Officer Koanui file a report against Defendant Letoto, Officer Koanui told Plaintiff that she could file a report against Letoto if she wanted, but that Officer Koanui now had an open case to arrest her for theft.

66.     Plaintiff understood this comment as a threat that Defendant Officer Koanui would take her into the station if she persisted, and that he would arrest her again and take her to the police station in the future if she continued to try to exercise her First Amendment rights. As a result, Defendant Koanui's actions dissuaded and prevented Plaintiff from filing the report against Defendant Letoto, both on the scene that day and in the future.

67.     Confused why she was being threatened with arrest after calling the police as a victim of a crime, Plaintiff dialed 911 a second time after speaking with Defendant Officer Koanui and requested further help. As a result, Defendant HPD

Sergeant Debra Maioho-Pohina arrived while Defendant Officer Koanui and Doe Officer 1 were still on the scene.

68.     Upon information and belief, however, Defendant Sergeant Maioho-Pohina did not take any action to stop Defendant Officer Koanui's misconduct at this time.

## C.     Plaintiff Seeks Redress Through Internal Police Department Mechanisms, to No Avail

69.     In the hours following Defendant Letoto's attack and Defendant Koanui's unconstitutional and malicious response, Plaintiff and her son, K.H., were extremely shaken and disturbed.

70.     Plaintiff called 911 again later on the night of June 10, 2019, requesting that Defendant Sergeant Maioho-Pohina come speak with K.H. to help calm him down after the trauma of the incident. Defendant Sergeant Maioho-Pohina offered to come back to the residence to discuss the incident.

71.     When Defendant Sergeant Maioho-Pohina arrived at the residence, she read Plaintiff her Miranda rights and stated that Plaintiff was a suspect in a criminal investigation.

72.     After Mirandizing Plaintiff, Defendant Sergeant Maioho-Pohina acknowledged to Plaintiff that there was something very wrong with the situation around the Defendant Officers' response to the incident. She offered to try to help Plaintiff put the pieces together and answer her questions. The next day Defendant

17

Sergeant Maioho-Pohina called Plaintiff to let her know that Officer Koanui had been on duty at the time Plaintiff called 911. Upon information and belief, however, Sergeant Maioho-Pohina did not do anything further to investigate or address Defendant Officer Koanui's misconduct.

73.     In the following days, Plaintiff was shocked to learn that Defendant Officer Koanui was, in fact, the co-owner of Exceptional Obedience, along with Defendant Letoto.

74.     Plaintiff only learned this fact because her partner, Michael Meyers, had arrived at the scene of the incident at some time between Defendant Letoto's attack and when HPD officers arrived. He had noticed that when Defendant Officer Koanui arrived, he and Defendant Letoto appeared to know one another. He later conducted an internet search and discovered that Defendants Officer Koanui and Letoto co-owned Exceptional Obedience.

75.     After learning this information, Plaintiff went to the police station in Kapolei. She explained the situation and told Doe Officer 2 that she had discovered Defendant Officer Koanui was a co-owner alongside Letoto.

76.     Doe Officer 2 told Plaintiff to follow up with HPD's Professional Standards Office about the incident. Eventually, Plaintiff spoke to a Detective Ho, who did not offer help but stated that if she wanted to, she could file a complaint.

Plaintiff continued to try to follow up with HPD numerous times over the next few weeks.

77.     When Plaintiff attempted to obtain a copy of the police report relating to the incident, HPD's Records Department staff stated that the investigation was still open. As a result, HPD staff told Plaintiff that, because she was the suspect in the case, she could not obtain the records.

78.     As recently as around October 2020—over a year after the incident occurred—HPD Records Department reiterated to Plaintiff that the theft investigation was still open under Plaintiff's name and that, accordingly, she could not obtain the records.

**D.     Defendant City and County of Honolulu Violates—and Shows Deliberate Indifference to—Plaintiff's Constitutional Rights**

79.     In at least three ways, Defendant City itself violated, and showed deliberate indifference towards, Plaintiff's constitutional rights under the First, Fourth, and Fourteenth Amendment to the U.S. Constitution. First, the City had— and continues to have—a de facto policy or custom permitting the very kind of abuse that Plaintiff suffered, and which did in fact cause the violations of Plaintiff's rights here. Second, the City failed to train, supervise, or discipline HPD officers regarding the very kind of violations against Plaintiff, and such failures caused the specific deprivation of Plaintiff's constitutional rights here. Third, when presented with plausible allegations that Defendant Officer Koanui (among others)

19

had engaged in unconstitutional conduct, the City, through official policymakers, made a deliberate choice from among various alternatives to endorse, approve, and ratify Defendant Officer Koanui's unconstitutional conduct.

### 1. Defendant City Has a De Facto Policy or Custom of Permitting HPD Officers' Selective Enforcement of the Law and Abuse of Law Enforcement Power To Further Personal and Private Interests

80.    Defendant City—and specifically HPD—has a de facto policy or custom of encouraging, permitting, defending, and otherwise supporting HPD officers' selective enforcement of the law and abuses of law enforcement power to further personal and private interests (the "Policy"). Misconduct of the same kind committed by Defendants against Plaintiff has been and is common and widespread within HPD's ranks. And it is precisely this Policy that was the moving force behind Defendant HPD officers' violations of Plaintiff's constitutional rights in this case.

81.    Past examples of the City's Policy abound. The most prominent relate to former HPD Chief Louis Kealoha, who was recently convicted of charges that involved flagrant abuses of power that were very similar to the abuses of power committed by Defendants here.

82.    The relevant indictment in Kealoha's criminal case alleged, among other things, that he: (1) conspired with others to target community members; (2) tried to discredit and intimidate such persons by falsely accusing them of criminal

activity; (3) attempted to secure evidence by misusing police resources and abusing his official position as law enforcement; (4) fabricated, altered, or concealed evidence to support false claims of criminal conduct; and (5) conducted numerous overt acts in furtherance of the conspiracy. Kealoha committed this misconduct—all of which is consistent with the City's Policy—specifically so that he could benefit and protect himself, his friends, and his family. And he did so at the expense of innocent citizens who suffered constitutional violations in his and his subordinates' hands.

83.    Importantly, Kealoha did not act alone. In accord with Defendant City's Policy, dozens of other HPD officers provided substantial assistance to him by abusing their own powers as law enforcement officers to support Kealoha's own abuses. Several of these subordinate officers—including Minh Hung "Bobby" Nguyen and Derek Hahn—were also tried and convicted in this District, and then sentenced to prison for their role in what the Chief Judge of this District agreed was a "conspiracy" to frame an innocent man with a crime.

84.    Former HPD Chief Kealoha's case involved the very same type of conflicts of interest and abuses of power that Defendants perpetrated against Plaintiff. There, an HPD police chief abused his police powers—with the help of dozens of other HPD officers who were in on the scheme—to frame an innocent man, all in an effort to advance his wife's position in a family dispute. Here, an

HPD officer—working with other HPD officers—abused his police powers to silence and frame an innocent crime victim, all in an effort to protect the officer's own business, as well as his friend and business partner.

85.     As another example of Defendant City's Policy, a complaint filed in this District (*i.e.*, Case No. 1:19-cv-00587-ACK-WRP) alleges that HPD officer Lianne Wolfram abused her position as a police officer to resolve a personal dispute by enlisting the help of fellow HPD officers to effect an unconstitutional seizure of a horse from an innocent citizen on Officer Wolfram's behalf.

86.     The complaint in that lawsuit alleges that Officer Wolfram gave a horse to Kimberly Hollandsworth but later changed her mind and sought to take back possession of the horse. On October 28, 2017, Officer Wolfram notified her supervisors at HPD of her intention to retrieve the horse. Then, in accord with Defendant City's Policy, Officer Wolfram sought—and was provided with—HPD assistance to carry out an unconstitutional seizure of the horse. When HPD officer Joseph Lum and another HPD officer accompanied Officer Wolfram—who was off-duty—to retrieve the horse from Ms. Hollandsworth, Officer Lum used his status as a police officer to intimidate Ms. Hollandsworth and abused his authority to declare that the horse belonged to Officer Wolfram, thereby effectuating the unconstitutional seizure of the horse on behalf of Officer Wolfram.

87.    As another example of Defendant City's Policy, in 2014, HPD officer Darren Cachola violently assaulted his then girlfriend in a public restaurant—an incident caught on surveillance footage in which Officer Cachola is seen repeatedly punching his girlfriend in the face. On April 23, 2017, HPD Officer Cachola again violently assaulted his ex-wife by strangling her, and two years later he assaulted her yet another time. In accordance with the City's Policy, when the police arrived on April 23, 2017, HPD Officer Kevin Bailey, accompanied by his supervising sergeant and lieutenant, intimidated Officer Cachola's ex-wife and insisted that she sign a false statement exclaiming that she had no injuries despite Officer Bailey's observation of strangle marks on her neck and a written report from another responding officer that there were reasonable grounds to believe that physical abuse or harm was inflicted by Officer Cachola.

88.    Consistent with the City's Policy, HPD did not arrest Officer Cachola and the responding officers did not photograph or document the physical injuries Officer Cachola had inflicted upon his ex-wife or conduct any investigation of the incident. And because of the City's Policy, Officer Cachola was emboldened to continue committing further acts of domestic violence with impunity, and with the expectation that he would receive assistance from fellow HPD officers to cover up, support, and carry out unlawful actions by abusing their police powers.

89.    The widespread and systemic nature of Defendant City's Policy is evident in other ways. Citing the Hawaii State Commission on the Status of Women, the Hawaiʻi Legislature found that, between May 2013 and September 2014, approximately one third of cases where women accused HPD officers of not responding appropriately to domestic violence involved an HPD officer or an officer's family member as the alleged abuser. The Commission referred to the incidents with Officer Cachola as part of a systemic "pattern" of misconduct.

90.    As an even more recent example of Defendant City's Policy, the ACLU of Hawaiʻi recently represented parents Jenna and Jorge Rivera in challenging the illegal and unconstitutional arrest of their then-fifteen-year-old son ("J.R.") in November 2018. HPD Officer Kirk Uemura—who was the father of a student who had been bullying J.R.—arrested J.R. the morning after the two students had gotten into a schoolyard fight.

91.    Despite the unambiguous conflict of interest, and in a shocking abuse of power, Officer Uemura and the other HPD officers involved improperly searched, interrogated, and arrested J.R. without reading him his Miranda rights or contacting his parents. The officers took J.R. to the police station, placed him in leg irons in a locked cell, photographed and fingerprinted him, and then waited over an hour before contacting his family.

24

92.     When J.R.'s parents raised alarm bells and asked the supervising

Sergeant why Officer Uemura had arrested J.R. despite the clear conflict of interest

present, the Sergeant tapped his badge and, in an explicit ratification of the

misconduct, claimed "that's what gives [Officer Uemura] the authority."

93.     In response to the incident, the Riveras filed a lawsuit in this District

against the HPD officers and the City in November 2020 (*i.e.*, Case No. 1:20-cv-

00458-HG-RT). The Rivera family demanded policy and other systemic reforms

within HPD, but the City refused to even consider policy change during settlement

discussions. Instead, the City agreed only to pay the Rivera family $150,000.

94.     Alarmingly, after the City approved the settlement, HPD declared that

existing department policies "were sufficient in providing direction to officers and

addressing conflicts of interest in this particular situation." In other words, HPD

stated that it did not think *anything* needed to change to address, prevent, or reduce

future instances of similar misconduct. It believed nothing wrong had occurred,

and that its existing policies and practices were adequate.

95.     In other words, despite being aware of the persistent problem—*i.e.*, of

HPD officers and supervisors, and even chiefs, abusing their powers in situations

presenting egregious conflicts of interest—HPD has changed none of its policies

and practices, and has instead doubled down on its position that its existing

policies and practices are sufficient. Such conduct by Defendant City shows that

the Policy is so well-settled and followed that it effectively has the force of law within HPD and the City.

96.     Upon information and belief, these examples represent just a sliver of the misconduct demonstrating the widespread existence of the Policy. The City's Policy is not limited to a few officers; it is longstanding, and runs widely and deeply throughout HPD ranks. It affects line officers, as well as supervisors. Misconduct of the kind condoned by the City's Policy happens so often that the City undeniably knows it is happening and deliberately chooses to ignore it.

97.     As a direct and proximate result of Defendant City's Policy, Plaintiff's constitutional rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution were violated. Specifically, in line with the City's Policy, Defendants Officer Koanui, Doe Officer 1, and Sergeant Maioho-Pohina ignored the conflict of interest presented by Defendant Koanui's relationship as the close friend and business partner of the suspect, Defendant Letoto, and permitted and facilitated the framing of Plaintiff for theft.

### 2. Defendant City Fails to Train, Supervise, and Discipline in a Manner Amounting to Deliberate Indifference to Plaintiff's Constitutional Rights

98.     Defendant City also fails to train, supervise, and discipline HPD officers for violating Plaintiff's (and others') constitutional rights, and such failures reflect deliberate indifference towards Plaintiff's (and others') constitutional rights.

99.    As a starting point, neither the City nor HPD has adopted for HPD a conflict-of-interest policy, or other related policies, procedures, and trainings to prevent officers from engaging in abuses of power in situations involving private or personal matters.

100.   The only City policies that could even remotely address conflicts of interest within HPD are the generalized Oath of Office and Standards of Conduct contained in HPD Policy 2.21—namely, articles III and V of the Standards of Conduct of the Honolulu Police Department—and HPD Policy 8.06 Section II.D, which prevents officers from investigating cases in which the officer is the victim or suspect.

101.   But even these policies are vague and do not prescribe specific protocols or procedures for addressing, managing, and preventing abuses of power in such conflict-of-interest situations.

102.   Despite its awareness of many past incidents of misconduct in situations involving egregious conflicts of interest (including those mentioned above), Defendant City has failed to enact affirmative policies and procedures:

    a.   Ensuring that HPD adequately identifies, manages, and prevents abuses of power for personal and private gain in conflict-of-interest situations;

b.  Requiring police officers to identify, disclose, document, and conflicts

of interest to supervisors or other superior officers (and to

complainants);

c.  Governing how supervisors and other superior officers assess,

evaluate, address, and mitigate the potential for misconduct when

conflicts of interest are reported.

103.    In failing to have a robust conflict-of-interest policy, HPD is different

from many other police departments nationwide. As an example from the Seattle

Police Department—one of the many police departments across the country that

does have a conflict-of-interest policy—the Seattle Police Department Manual,

Title 5, Section 5.001 §§18 and 19 provides in part that:

18.  Employees Must Avoid Conflicts of Interest

Employees will not engage in enforcement, investigative, or
administrative functions that create or give the appearance of
conflicts of interest.

Employees will not investigate events where they are involved.  This
also applies where any person with whom the employee has a
personal relationship is involved in the event.

Except in cases of emergency, officers will not arrest family
members, business associates, or social acquaintances.

19. Employees Must Disclose Conflicts

Employees will immediately disclose to the Chief of Police, via their
supervisor, any activities or relationships that may present an actual,

potential, or apparent conflict of interest for themselves or other Department employees.

104.   The refusal to implement adequate policies to address conflict-of-interest situations means that the City and HPD fail to adequately train, supervise, and discipline officers who abuse their power in conflict-of-interest situations.

105.   Moreover, the failure to implement a conflict-of-interest policy runs counter to the many other bodies that have called for policy and systemic change within HPD to prevent similar abuses of power. In November 2020, the Honolulu Police Commission asked then-Chief Susan Ballard to implement a conflict-of-interest policy. Then, in December 2020, the City's Auditor issued an audit report that, among other things, "called into question how the police department identified, responded to, corrected, and prevented misconduct" in light of widespread "evidence of conflicts of interest, acting criminally while not following key police responsibilities and standards, and not acting in the public interest and trust." Despite these serious admonishments from sources specifically intended to provide government oversight, HPD declined to implement sufficient policies as requested.

106.   On or about May 10, 2021, Plaintiff filed with HPD's Professional Standards Office a signed and notarized complaint accusing Defendant Officer Koanui of substantially the same misconduct as alleged here.

107.   On or about May 13, 2021, Defendant City—via a letter from Major Gregory Osbun of the Professional Standards Office—sent Plaintiff a letter response stating that HPD would not be conducting a disciplinary investigation of Defendant Officer Koanui and/or the incident because of the collective bargaining agreement with the State of Hawaii Organization of Police Officers (SHOPO).

108.   Upon information and belief, despite the systemic and widespread pattern of prior misconduct known to Defendant City and HPD, HPD has failed to train, supervise, or discipline adequately its officers who have committed misconduct.

109.   Upon information and belief, HPD further has not substantially modified its protocols for training, supervising, or disciplining its officers when they commit misconduct of the kind that occurred to Plaintiff.

110.   Such failures by Defendant City show deliberate indifference to Plaintiff's rights under the First, Fourth, and Fourteenth Amendments.

111.   And such failures are also precisely what caused, and were the moving force behind, the deprivation of Plaintiff's constitutional rights here.

### 3. An HPD Official With Final Policy-Making Authority for Defendant City Ratifies Defendant Officers' Unconstitutional Conduct

112.   On May 19, 2021, Plaintiff, through her undersigned counsel, sent a letter to HPD's then-Chief Susan Ballard and now-Interim Chief Rade Vanic

describing the myriad ways in which HPD, through Defendant Officer Koanui, had "subjected [her] to an unconstitutional arrest and silencing of her First Amendment rights . . . during a June 10, 2019 incident that presented an egregious conflict of interest for the primary HPD officer involved."

113.   Plaintiff's letter included detailed allegations and evidence that Defendant Officer Koanui had engaged in improper and unconstitutional conduct. To support the allegations, Plaintiff's letter included a notarized and signed complaint filed with HPD's Professional Standards Office that described, in more detail, HPD's and Defendant Officer Koanui's unconstitutional and unlawful conduct and listed the witnesses and evidence supporting the allegations, including home security camera footage that captured a substantial portion of the incident.

114.   Plaintiff's letter also "express[ed] serious concerns about HPD's ongoing disregard of conflicts of interest (and related abuses of power) within its ranks."

115.   Plaintiff's letter "demand[ed] that HPD take immediate action" to address both issues. Specifically, Plaintiff's letter demanded that HPD do two things:

> (1) "thoroughly and impartially investigate Officer Koanui and other
> HPD officers' misconduct during the June 10, 2019 incident involving
> Ms. Hall, and take meaningful disciplinary action," and

(2) "implement policies, practices, procedures, trainings, and other measures to detect, identify, document, report, and manage conflicts of interest in policing, as well as procedures to impose disciplinary action when such policies are violated."

116.   On June 4, 2021, HPD Interim Chief Vanic—who, as the current head of HPD, is an official policymaker for the City—responded to Plaintiff's letter.

117.   Given that he responded to Plaintiff's letter, Interim Chief Vanic was specifically aware of the misconduct that Plaintiff alleged Defendant Officer Koanui had engaged in.

118.   In his letter response, Interim Chief Vanic ratified Defendant Officer Koanui's unconstitutional conduct. He expressly approved of Officer Koanui's acts, defended Koanui's conduct, and confirmed HPD's position that Officer Koanui had done nothing improper during the June 10, 2019 incident.

119.   Interim Chief Vanic confirmed that Plaintiff "was subject to a criminal complaint arising out of the June 10, 2019 incident," but insisted that she "was not arrested" on that day.

120.   Interim Chief Vanic also stated that "HPD cannot conduct an administrative investigation against Officer Christopher Koanui," thus conveying the City's official position and decision that it would not investigate Defendant

32

Officer Koanui or other officers regarding the June 10, 2019 incident involving Plaintiff.

121.   In response to Plaintiff's demand that HPD implement conflict-of-interest policies, Interim Chief Vanic ratified the City's Policy by claiming that current policies were sufficient. Specifically, Interim Chief Vanic stated that "current HPD department policy and training require that officers perform their duties impartially and fairly."

122.   Interim Chief Vanic thus made the deliberate choice to condone and ratify both Defendant Officer Koanui's misconduct and the City's Policy.

123.   Interim Chief Vanic made this deliberate choice even though he had many other alternative courses of action he could have taken, including acknowledging that Defendant Officer Koanui had engaged in misconduct by intervening in an incident in which his close friend and business partner was involved and/or committing to implementing a robust conflict of interest policy.

124.   Interim Chief Vanic made none of these choices. Instead, he deliberately chose to condone and ratify Defendant Officer Koanui's misconduct as well as the City's longstanding Policy.

125.   Despite Defendant Sergeant Maioho-Pohina's acknowledgement that there was something very wrong about what had happened on the day of the incident, upon information and belief, Defendant City—and specifically HPD—

took no corrective actions to train, supervise, discipline, or reprimand any of the officers involved.

126.   Defendant Officer Koanui has not been—and will never be—disciplined or further trained in connection with the June 10, 2019 incident.

127.   Upon information and belief, Defendant City made no effort to implement any sort of corrective actions to prevent similar incidents of misconduct in the future.

128.   The City has, in other words, squarely ratified the unconstitutional conduct that occurred by HPD officers on June 10, 2019.

**E.    Defendant City and Defendant HPD Officers' Conduct Causes Harm to Plaintiff**

129.   As a direct and proximate result of Defendant City and Defendant HPD officers' conduct, Plaintiff has suffered intense stress, physical pain, mental anguish, anxiety, fear, helplessness, embarrassment, anger, and severe emotional distress. Plaintiff has also required medical treatment and care as a result of the incident.

130.   Further, Plaintiff has acquired a mistrust of HPD and fears that Defendant Officer Koanui will intercept any future 911 calls that she makes, and/or retaliate against her again for her attempts to seek redress.

131.   In fact, shortly after the incident, Plaintiff drafted and planned to file for a restraining order against Defendant Officer Koanui. Ultimately, Plaintiff decided against submitting the filing because she feared further retaliation.

132.   Plaintiff also fears interactions with other HPD officers and is specifically concerned that Defendants will further violate her constitutional rights.

133.   The threat of a potential future arrest and the knowledge that she has an open criminal charge on her record has also loomed over her for the past couple of years. This has caused serious psychological distress. Additionally, this has caused Plaintiff to refrain from applying to desired employment opportunities with the government, which require thorough criminal background checks. The baseless criminal investigation initiated by Defendants has had far-reaching collateral consequences for Plaintiff, which will likely extend throughout her lifetime.

## **CLAIMS FOR RELIEF**

### **Claim 1: Violation of First Amendment Right to Petition the Government for Redress of Grievances, 42 U.S.C. Section 1983 (Against Officer Koanui and Doe Officer 1)**

134.   Plaintiff realleges and incorporates all previous allegations.

135.   At all relevant times, Defendants were persons purporting to act under color of state law.

136.   The Petition Clause of the First Amendment guarantees, in part, "the right of the people . . . to petition the Government for a redress of grievances."

This right ensures that people can petition all departments of government. The right to petition specifically grants people the right to access police and judicial procedures for redress of grievances and wrongs, including through the submission and/or filing of criminal complaints with law enforcement officials.

137.   After Defendant Letoto attacked Plaintiff at the home where she was residing, she called 911 so that she could exercise her clearly established First Amendment right to petition by reporting to the police the ongoing crime being committed by Defendant Letoto.

138.   After Defendants Officer Koanui and Doe Officer 1 arrived on scene, Plaintiff attempted to exercise her right to petition by filing a complaint of criminal activity against Defendant Letoto.

139.   But instead of allowing Plaintiff to exercise her First Amendment rights, Defendants deprived Plaintiff of her First Amendment right to petition.

140.   When Plaintiff sought to exercise her petition right by trying to file a criminal police complaint against Defendant Letoto, Defendant Officer Koanui infringed that right by refusing to take down her complaint.

141.   Defendant Doe Officer 1, who accompanied Defendant Officer Koanui, acquiesced in Defendant Officer Koanui's infringement of Plaintiff's First Amendment rights. Upon information and belief, Doe Officer 1 also refused to take down Plaintiff's complaint against Defendant Letoto.

36

142.   Defendants had no valid justification for the deprivation of Plaintiff's First Amendment right to petition.

143.   As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered injury for which Defendants are liable.

144.   Defendants acted knowingly, willfully, with malicious intent, and in reckless disregard for Plaintiff's constitutional rights and in violation of clearly established law.

### Claim 2: First Amendment Retaliation, 42 U.S.C. § 1983
### (Against Officer Koanui and Doe Officer 1)

145.   Plaintiff realleges and incorporates all previous allegations.

146.   When Plaintiff sought to file a criminal complaint against Defendant Letoto with Defendants Officer Koanui and/or Doe Officer 1, she was engaged in constitutionally protected activity in that she was exercising her clearly established First Amendment right to petition the government for redress.

147.   Defendants Officer Koanui and Doe Officer 1 knew the particular threat that Plaintiff's exercise of her First Amendment right would have on Officer Koanui. Specifically, they knew that if Plaintiff filed a criminal complaint against Defendant Letoto, this would have negative consequences for Officer Koanui's friend and business partner, as well as Officer Koanui's personal business interests.

148.   Knowing the threat posed if Plaintiff were in fact able to exercise her First Amendment rights, Officer Koanui sought to unlawfully interfere with and

37

retaliate against such exercise through a series of adverse actions, including by filing a false and misleading report against Plaintiff for theft, arresting her, and threatening to arrest her in the future if she persisted in trying to report Defendant Letoto's crimes to the police.

149.   Defendant Doe Officer 1, who accompanied Defendant Officer Koanui, acquiesced in Defendant Officer Koanui's infringement—and also directly engaged in the infringement—of Plaintiff's First Amendment rights. Specifically, Doe Officer 1 assisted in and contributed to the filing of the false and misleading report against Plaintiff for theft.

150.   Plaintiff's protected First Amendment activity was the motivating factor—and at least a substantial motivating factor—behind Defendants' conduct.

151.   Defendants' retaliation injured Plaintiff by restraining, preventing, and impairing her ability to exercise her First Amendment right to petition in a way likely to chill a person of ordinary firmness from engaging in further First Amendment activity.

152.   Defendants' retaliatory acts did in fact cause Plaintiff to abstain from taking further steps or making further efforts to report the crimes committed by Defendant Letoto.

153.   As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered injury for which Defendants are liable.

38

154.   Defendants acted knowingly, willfully, with malicious intent, and in reckless disregard for Plaintiff's constitutional rights and in violation of clearly established law.

**Claim 3: Fourth Amendment False Arrest/Imprisonment, 42 U.S.C. § 1983**
**(Against Officer Koanui and Doe Officer 1)**

155.   Plaintiff realleges and incorporates all previous allegations.

156.   At no point did any of the Defendants have a warrant authorizing the seizure and arrest of Plaintiff, nor did Defendant Officer Koanui or any other officer have a legally valid basis for believing that Plaintiff committed a crime or offense that would permit Plaintiff's arrest, detention, and/or imprisonment.

157.   Defendant Doe Officer 1, who accompanied Defendant Officer Koanui to the scene, was responsible for monitoring the actions of Defendant Officer Koanui failed to intervene to prevent the continued unlawful arrest, detention, and/or imprisonment of Plaintiff.

158.   At the time Plaintiff was falsely arrested and imprisoned, Plaintiff had a clearly established constitutional right under the Fourth Amendment to the U.S. Constitution to be free from unreasonable seizures.

159.   Defendants acted knowingly, willfully, with malicious intent, and in reckless disregard for Plaintiff's constitutional rights and in violation of clearly established law.

## Claim 4: Fourteenth Amendment Malicious Abuse of Process, 42 U.S.C. § 1983
## (Against Officer Koanui, Sergeant Maioho-Pohina, Doe Officer 1, Doe Officer 2, and Doe Officer 3)

160.   Plaintiff realleges and incorporates all previous allegations.

161.   Defendants Officer Koanui, Sergeant Maioho-Pohina, Doe Officer 1, Doe Officer 2, and Doe Officer 3 intentionally, knowingly, and maliciously initiated and maintained a criminal complaint and investigation against Plaintiff without probable cause to do so, and for the ulterior purpose of using the criminal legal process to intimidate, threaten, and dissuade Plaintiff from filing a report against Defendant Officer Koanui's close friend and business partner, Defendant Letoto.

162.   Defendants did not seek to pursue legitimate criminal charges, but instead maliciously and deliberately misused and abused their authority to initiate and maintain a criminal investigation and/or proceeding to intimidate, threaten, and dissuade Plaintiff from pursuing legitimate claims against Defendant Letoto.

163.   Defendants' intentional, willful, and malicious use of the criminal legal process was not proper in the regular conduct of such process, and proximately caused the injuries alleged here.

164.   As a result of Defendants' malicious abuse of process, Plaintiff both has been fearful of a criminal prosecution and/or conviction, and has an open theft charge on her record that may have far-reaching consequences throughout her

lifetime, which has already prevented her from seeking out and securing desired employment opportunities with the U.S. government.

**Claim 5: Violation of Fourteenth Amendment Equal Protection, 42 U.S.C. § 1983**
**(Against Officer Koanui, Sergeant Maioho-Pohina, Doe Officer 1, Doe Officer 2, and Doe Officer 3)**

165.    Plaintiff realleges and incorporates all previous allegations.

166.    Defendant Officer Koanui, with assistance and support from Defendant Letoto, as well as Defendants Sergeant Maioho-Pohina, Doe Officer 1, Doe Officer 2, and Doe Officer 3, knowingly, intentionally, maliciously, and with reckless disregard for Plaintiff's constitutional rights under the Fourteenth Amendment of the Constitution of the United States filed a false and misleading report and unlawfully interrogated and arrested Plaintiff without probable cause.

167.    Defendant Officer Koanui engaged in this conduct despite allegations that his close friend and business partner, Defendant Letoto, had assaulted Plaintiff and broke and entered into her residence—and he did not file a report against, charge, or arrest Defendant Letoto.

168.    There was no rational basis for the disparate treatment between Plaintiff and Defendant Letoto solely based upon Defendant Letoto's status as Defendant Koanui's private business partner.

169.    By discriminating, without any rational basis, in the provision of police protection by filing a police report against Plaintiff for theft while

simultaneously refusing to write up a police report against Defendant Letoto, Defendants' selective enforcement of the law violates Plaintiff's clearly established constitutional right to equal protection of the law under the Fourteenth Amendment and constitutes a clear abuse of law enforcement power.

170.   Additionally, by treating Plaintiff differently on account of her attempting to exercise her First Amendment rights to file a police complaint against a friend and business partner of Defendant Officer Koanui, Defendants also violated Plaintiff's clearly established constitutional right to equal protection.

### Claim 6: Conspiracy to Interfere with Civil Rights, 42 U.S.C. § 1983 (Against Defendants Officer Koanui and Letoto)

171.   Plaintiff realleges and incorporates all previous allegations.

172.   Defendants Officer Koanui and Letoto plotted, coordinated, reached, and entered into a specific agreement, express or implied, with the specific common purpose to deprive Plaintiff of the equal protection of the laws, her First Amendment rights to petition the government for redress and be free from retaliation, her Fourth Amendment right to be free from unreasonable seizures, and her right to be free from harm imposed by malicious abuse of the legal process.

173.   To that end, Officer Koanui and Letoto acted jointly with the specific common purpose of silencing Plaintiff. They did this by preventing her from filing a police report against Letoto, and instead opening a false and misleading police

report against her, and using that police report to threaten further arrest if she persisted in trying to exercise her constitutional rights.

174.   Defendants Officer Koanui and Letoto committed numerous overt acts in furtherance of the conspiracy, as set forth in the paragraphs above. Additionally, Defendant Letoto called Officer Koanui through non-official channels or means, and then alerted Officer Koanui that Plaintiff was seeking police help to stop Letoto from continuing to assault her and break into her residence. As a result, Officer Koanui responded to the scene to prevent her from filing a report against Letoto.

175.   Defendants Officer Koanui and Letoto also acted jointly to create an atmosphere of intimidation and to retaliate against Plaintiff for the exercise of her constitutionally protected rights.

176.   As a result of the express or implied agreement and/or one or more of the illegal, overt acts set out in the above paragraphs committed in furtherance of this conspiracy, Plaintiff suffered various injuries to her person, including severe emotional distress, and suffered the deprivation of one or more of her rights guaranteed by the Constitution or laws of the United States.

### Claim 7: Supervisory Liability, 42 U.S.C. § 1983
### (Against Sergeant Maioho-Pohina and Doe Officer 2)

177.   Plaintiff realleges and incorporates all previous allegations.

43

178.   Defendants Sergeant Maioho-Pohina and Doe Officer 2 were acting in their capacity as supervising officers at all relevant times.

179.   On at least two separate occasions—*i.e.*, both during the June 10, 2019 incident and then later that evening—Plaintiff spoke to Defendant Sergeant Maioho-Pohina at the residence. Plaintiff explained the multiple ways in which Officer Koanui had committed misconduct against her.

180.   On at least one occasion—*i.e.*, shortly after the June 10, 2019 incident, Plaintiff spoke to Doe Officer 2 at Kapolei Police Station. Plaintiff explained the multiple ways in which Officer Koanui had committed misconduct against her.

181.   During each occasion, Defendants—who are HPD Sergeants and supervisory officials—expressly condoned, defended, and ratified Officer Koanui's actions with knowledge that his conduct—in a situation presenting unambiguous conflicts of interest—violated Plaintiff's constitutional rights and constituted an improper abuse of power.

182.   Defendants also knew that Officer Koanui was engaged in a violation of federal law and a deprivation of Plaintiff's constitutional rights but were deliberately indifferent to the consequences of the subordinate officer's conduct.

183. Defendants failed to intervene by reprimanding, flagging, or otherwise disciplining Defendant Officer Koanui and other HPD officers involved after learning about the incident.

184. Defendants acted knowingly, willfully, with malicious intent, and in reckless disregard for Plaintiff's constitutional rights and in violation of clearly established law.

### Claim 8: *Monell* Liability for Policy or Custom, 42 U.S.C. § 1983 (Against City and County of Honolulu)

185. Plaintiff realleges and incorporates all previous allegations.

186. Defendant City—and specifically HPD—have maintained a policy or custom of permitting, condoning, encouraging, or covering up police officer's selective enforcement of the law and abuses of law enforcement power in matters involving the private and/or personal affairs of HPD officers and their family members, business associates, and friends.

187. Defendant City's policy is pervasive, widespread, and so long-standing and prevalent as to rise to the level of official policy.

188. Defendant City's policy was in fact confirmed and ratified by HPD Interim Chief Vanic through his June 4, 2021 letter response to Plaintiff.

189. Defendant City's policy violates the Equal Protection Clause of the Fourteenth Amendment because it irrationally and impermissibly discriminates

against ordinary citizens as opposed to those who are police officers and/or friends or family members of police officers.

190.   Defendant's policy violates the Fourth Amendment and the Substantive Due Process Clause of the Fourteenth Amendment because it permits, condones, encourages, and/or conceals acts committed under color of law which violate citizen's constitutional rights.

191.   Defendant City knew or should have known that because of its longstanding adherence to its policy or custom, it encouraged and emboldened Defendant Officer Koanui to act with reckless disregard and/or deliberate indifference to Plaintiff's constitutional rights.

192.   Defendant City knew or should have known that because of its policy or custom, Doe Officer 1, Doe Officer 2, and Doe Defendants would be encouraged and emboldened to permit, cover up, ratify, condone, defend, and otherwise assist Defendant Koanui in violating Plaintiff's constitutional rights by themselves acting with reckless disregard and/or with deliberate indifference to Plaintiff's constitutional rights.

### Claim 9: *Monell* Liability for Failure to Train, Supervise, and Discipline, 42 U.S.C. § 1983
### (Against City and County of Honolulu)

193.   Plaintiff realleges and incorporates all previous allegations.

194.   Defendant City was obligated to enact specific affirmative policies and procedures to prevent constitutional harms from occurring, and to sufficiently supervise and train HPD officers to protect the public from harm.

195.   Defendant City failed to enact any policies or procedures to prohibit police officers from influencing or participating in law enforcement actions where an officer has an actual or potential conflict of interest, including when an officer's personal or business interests and/or the interests of family members or friends are at issue.

196.   Despite its officials having been put on notice of countless instances involving a police officer's conflicts of interest with family or personal affairs, several of which are described in detail here, Defendant City has failed to adopt any policies or procedures to address the foreseeable misconduct and constitutional harms therefrom, have tacitly approved of the wholly deficient policies.

197.   Similarly, despite the systemic and widespread pattern of prior misconduct known to Defendant City and HPD, Defendant City has failed to train, supervise, or discipline adequately its officers who have committed misconduct.

198.   Since the time that the Kealoha scandal became public, HPD has not substantially modified its protocols for training, supervising, or disciplining its officers when they commit misconduct of the kind that occurred to Plaintiff.

199.   Such failures by Defendant City to train, supervise, and discipline show deliberate indifference to Plaintiff's rights under the First, Fourth, and Fourteenth Amendments.

200.   Defendant City's failure to train, supervise, and discipline officers so as to prohibit and prevent conflicts of interest in the enforcement of the law was the moving force behind the deprivation of Plaintiff's constitutional rights.

## Claim 10: *Monell* Liability for Ratification of Unconstitutional Conduct, 42 U.S.C. § 1983
### (Against City and County of Honolulu)

201.   Plaintiff realleges and incorporates all previous allegations.

202.   On May 19, 2021, Plaintiff sent a letter to two of Defendant City's official policy-makers—*i.e.*, HPD's then-Chief Susan Ballard and HPD's now-Interim Chief Rade Vanic—describing the myriad ways in which HPD, through Defendant Officer Koanui, had violated her constitutional rights.

203.   Through Plaintiff's May 19, 2021 letter, Defendant City received specific and detailed notice of plausible allegations, supported by documentation and other corroborating evidence, that Defendant HPD officers, including Officer Koanui, had engaged in unconstitutional conduct.

204.   Defendant City—through HPD Interim Chief Vanic's June 4, 2021 letter responding to Plaintiff's letter—ratified Defendant Officer Koanui's unconstitutional conduct. Specifically, Interim Chief Vanic both made statements

48

defending, adopting, and expressly approving of the acts of Officer Koanui, and also made the decision that HPD would not investigate Officer Koanui's conduct on June 10, 2019.

205.  Interim Chief Vanic made these deliberate choices from among many alternative courses of conduct.

206.  In ratifying Defendant Officer Koanui's unconstitutional conduct through an official with final decision-making authority, Defendant City had a policy subjecting it to municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

### Claim 11: Intentional Infliction of Emotional Distress (Against Officer Koanui and Letoto)

207.  Plaintiff realleges and incorporates all previous allegations.

208.  Defendants Officer Koanui and Letoto's conduct towards and treatment of Plaintiff was extreme, outrageous, unreasonable, and beyond all bounds of human decency.

209.  Defendants Officer Koanui and Letoto acted maliciously, knowingly, deliberately, and with reckless disregard for the constitutional rights and well-being of Plaintiff.

210.  Defendants Officer Koanui and Letoto's conduct was intended to and proximately caused Plaintiff to suffer severe emotional trauma and distress.

## Claim 12: Civil Conspiracy
### (Against Officer Koanui and Letoto)

211.   Plaintiff realleges and incorporates all previous allegations.

212.   Defendants Officer Koanui and Letoto conspired with one another to cause the unlawful arrest and silencing of Plaintiff.

213.   Each of the Defendants' acts of collusion and conspiracy proximately caused the damages alleged.

## Claim 13: Assault and Battery
### (Against Letoto)

214.   Plaintiff realleges and incorporates all previous allegations.

215.   Defendant Letoto intended to and did cause Plaintiff apprehension of an imminent harmful and offensive contact with her person to which she did not consent.

216.   Defendant Letoto intended to and did cause Plaintiff harmful and offensive contact with her person to which she did not consent.

217.   Defendant Letoto acted herein willfully, maliciously, and with conscious disregard for Plaintiff's rights, and knew or should have known that his conduct was offensive and certain to cause injury, pain, fear, apprehension, and humiliation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

A.     Enter an order declaring that Defendants have violated Plaintiff's

rights under the First, Fourth, and Fourteenth Amendments to the U.S.

Constitution and under Hawai'i law;

B.     Issue a permanent injunction preventing and restraining Defendants

from continuing to violate Plaintiff's rights;

C.     Issue a permanent injunction requiring Defendant City to implement

policies, practices, procedures, trainings, and other measures to detect,

identify, document, report, manage, and prevent conflicts of interest in

policing, as well as adequate procedures to impose disciplinary action when

such policies are violated;

D.     Issue a permanent injunction requiring Defendants to expunge any

and all criminal and/or police records for Plaintiff generated as a result of

Defendants' unconstitutional conduct;

E.     Retain jurisdiction over Defendants until such time as the Court

and/or a Court-appointed independent monitor, is satisfied that Defendants'

unlawful policies, customs, and practices complained of here no longer exist

and will not recur;

F.     Award general and special damages;

G.     Award punitive damages;

H.     Award reasonable attorneys' fees, costs, and other expenditures

incurred as a result of bringing this action, pursuant to 42 U.S.C. 1988 and

other applicable laws;

I.      Order such other relief as the Court deems just and proper.


DATED:  Honolulu, Hawai'i, June 9, 2021.


                                    /s/ Jongwook "Wookie" Kim
                                    JONGWOOK "WOOKIE" KIM
                                    ACLU of Hawaii Foundation

                                    Attorney for Plaintiff
                                    ROBIN HALL