ACLU OF HAWAII FOUNDATION

JONGWOOK "WOOKIE" KIM   #11020
EMILY M. HILLS           #11208
P.O. Box 3410
Honolulu, Hawaii 96801
Telephone: (808) 522-5905
E-mail:    wkim@acluhawaii.org
           ehills@acluhawaii.org

Attorneys for Plaintiff
ROBIN HALL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| ROBIN HALL<br><br>                Plaintiff,<br>  vs.<br><br>CITY AND COUNTY OF HONOLULU; CHRISTOPHER KOANUI; LEONARD LETOTO; DEBRA MAIOHO-POHINA; JOHN LEO CASTILLO<br><br>                Defendants. | CASE NO. CV 21-00248 LEK-KJM<br><br>[CIVIL RIGHTS ACTION]<br><br>**SECOND DECLARATION OF ROBIN HALL** |
|---|---|

I, ROBIN HALL, declare as follows:

1. I make this declaration based on my personal knowledge and if called to testify I could and would do so competently as follows.

2. I am the Plaintiff in this lawsuit.

3. In April 2019, I started working for "Exceptional Obedience" ("EO"), a dog training business, as an administrative assistant. My main duty was scheduling dog-training appointments for the business.

4. I was hired by Defendant Leonard Letoto, who was my boss during my employment with EO. At the beginning of my employment, Letoto gave me a cell phone to use to schedule dog-training appointments.

5. From the very beginning of my employment with EO, it became clear to me that Letoto was extremely challenging to work with as a boss. He was condescending and confrontational in his interactions with me. He would call me frequently, averaging one to two hours minimum per day, several days a week, and use harassing and degrading language towards me and others.

6. I worked for EO for six weeks and was supposed to be paid every two weeks. Letoto made my first two-week payment via electronic money transfer through the PayPal app. However, Letoto did not pay me for the second two weeks I worked. I then worked for an additional two weeks, despite not being paid.

7. My working relationship with Letoto deteriorated further as time went on. He accused me of not getting my work done in the time allotted. Even though he only paid me for 2 hours of work per day, Letoto expected me to be on call Monday through Saturday from the time his business opened to the time the business was closed, which is way more than 2 hours per day.

8. During my time working for EO, I was contacted by a former receptionist of EO who said that Letoto had not paid her despite providing her with a check. I was also contacted by a former EO client who was irate that Letoto had not paid back a refund that was owed to the client. This information led me to distrust Letoto when it came to making payments.

9. On June 10, 2019, I texted Letoto asking if he had decided not to pay me. Instead of responding with a text message, Letoto called me. Letoto again conveyed to me his belief that I was not getting my work done in the time he had allotted. And he told me he did not think I deserved to get paid because of this, and he did not feel like he owed me money. I understood this to mean that I might not get paid for anything.

10. I told him I did not think our working relationship was going well. He refused to make my final payment via PayPal, which I found truly unusual, given that that is how we initially agreed I would be paid (and that was the only way I had been paid). Although I regarded Letoto's earlier refusal to pay me as him firing

me, during the phone call, I felt that we mutually agreed to part ways. We also agreed that he would give me my total payment in cash.

11. Since PayPal was no longer an option, I asked for my total payment to be in cash because of Letoto's past failures to pay me and the accounts I had heard of his former receptionist and client who felt they were not paid what they were due.

12. During my time working for EO, I never met Defendant Officer Christopher Koanui. The first time I met my boss, Officer Koanui, was the day he responded to my 911 emergency call on June 10, 2019.

13. Letoto and I agreed that he would meet me at my house to give me the cash and pick up his phone.

14. Letoto arrived at the house that afternoon and handed me a check. I told him that he was supposed to bring me cash. He said "take it or leave it", so as a compromise, we agreed to go to the bank together so I could cash the check right away. Letoto never mentioned the phone during that conversation.

15. As it was, I figured I would give Letoto the EO phone after the check cleared at the bank. I never planned to "steal" the phone or keep it for longer than it took to get to the bank and cash the check.

16. After agreeing to meet me at the bank, Letoto said "okay" and began to walk away, and I closed the door so I could go get my purse. I closed the door

(which opens inward) completely, but after I did so, Letoto swiveled, lunged at the door, put his thumb on the door and unlatched it, then violently assaulted me with the door by shoving it into me with the full weight of his body.

17. When he shoved the door inwards towards me, the door handle hit me in the front-left side of my hip twice, causing significant pain. Letoto then placed his foot between the door and the threshold to prevent it from closing.

18. Later, an emergency room physician diagnosed me with a contusion on my hip caused by Letoto slamming the door into me. I was also limping for about 2 to 2.5 weeks after the incident.

19. As he was slamming the door into me, I was completely panicked. I was so scared about what he was doing to me, and what he might do to me, especially knowing how hostile and derogatory he had been towards me while I worked for EO.

20. I immediately got my phone and called 911. I desperately reiterated to the dispatcher that this was an emergency, and that my boss had just broken into the house and assaulted me and was still trying to make entry. I told the dispatcher that I was hurt as a result of the assault. I was basically begging this dispatcher for help. I also provided Letoto's full name and business information to the dispatcher, and that I was his receptionist. I also let her know that he was calling someone.

21. About 20 minutes after my first 911 call, HPD officers still had not arrived, which I found to be surprising. I called 911 a second time to ask what was taking so long and when officers would arrive. I was also surprised that officers did not arrive with their "lights and sirens" on, given that I told 911 dispatch that I was violently assaulted. I only knew officers had arrived, and went to meet them at the door, because my landlord, Mike Myers, told me that officers had arrived.

22. Letoto eventually removed his foot from the door, allowing it to close. I then observed Letoto through the window of the door taking out his cell phone and making a phone call.

23. I then observed Letoto walk down the driveway to the street, get in his large, white van, and park it on the street across and completely blocking the driveway to prevent anyone from entering or leaving the house.

24. Eventually, Officer Koanui, who I had never met and did not know to be one of my bosses at the time, arrived and walked to my front door, with Officer John Castillo trailing close behind. When I opened the door to let him in, I was initially so relieved, believing that the police were there to protect me.

25. When I began telling Officer Koanui what happened, he immediately cut me off and informed me that he was already aware of the allegations Letoto had made against me regarding the phone. He also accused me of committing

extortion. I was alarmed that Officer Koanui would interrupt me in this way. This was the point when I began to realize that Officer Koanui was not there to help me.

26. Once Officer Koanui stopped explaining to me that he was investigating me for extortion, I gave him my full account of Letoto's assault and stated that I wanted to "press charges." Throughout the time that I was giving this account, Officer Castillo was standing right behind Officer Koanui and was within earshot.

27. Throughout Officer Koanui's time at the scene, he attempted to persuade me not to press charges. He used a coercive and intimidating tone. I felt threatened not to press charges. Officer Koanui made it clear that HPD already had an open case against me for extortion or theft of the phone, and based on what he said, I thought I would be arrested if I made a cross-complaint against Letoto. He also insinuated that Letoto had been justified in assaulting me and breaking into my house to recover his property.

28. After I finished giving my account of the assault, Officer Koanui asked if I would be able to bring up the video surveillance footage of my assault. I said yes and motioned to a back room of my home where my television was located. He then asked if could show him video surveillance footage of the assault, pointing to the room I had motioned towards.

29. At this point, I did not feel that I had a choice, since Koanui had made it clear that he was investigating me for a felony. I did not believe that I had the ability to deny his request. So, I agreed and Koanui followed me into the house to look at the video.

30. Officer Koanui walked close behind me to the living room of my home. After arriving at the television set, I faced him and explained to him that Letoto and I had an agreement that he was supposed to pay me in cash.

31. Koanui stood in front of me with a wide stance and talked authoritatively. He told me that I would be arrested if I pursued charges against Letoto and emphasized multiple times that the case Letoto had against me for extortion was a felony.

32. During this conversation, Officer Koanui paid little mind to my repeated insistence that Letoto had hit me with the door and instead kept returning to the fact that I had committed extortion, and repeatedly emphasized that that was a B felony. I was shocked that he was so dismissive of my statements regarding the crime that I was a victim of.

33. Officer Koanui then went to sit on the portion of a couch closest to the hallway, between me and the exit from the room. Very soon after he sat down, Officer Koanui told me to go sit on the couch. Because Officer Koanui had been

insisting he could arrest me for serious charges, I felt that I had no choice but to comply and sit on the couch.

34. I did not feel free to leave during this conversation. Because there is a steep cliff behind our home, the only exit from the house is through the driveway. I knew the driveway was blocked by Letoto's truck, and I knew that Officer Castillo was out there as well.

35. Throughout Officer Koanui's time at the scene, I maintained that I wanted to press charges (including by telling Officer Koanui that I wanted to do so during our very first conversation) against Letoto. I never said or did anything to retract my desire to press charges.

36. Officer Koanui asked me if I was withholding the phone, and I told him, "I'm not withholding the phone."

37. After speaking with me on the couch, Officer Koanui left, saying he was going to talk to Letoto and get statement forms.

38. Soon after he walked out of the house, I spoke to a third party, Iris Griego about what was happening. At this point, I felt like I was in shock because Letoto had assaulted me and now I was being arrested for a felony.

39. Ms. Griego returned the phone to Letoto for me, since I did not feel comfortable being near him.

40. While Koanui was out of the house, I called 911 to explain that Koanui was arresting me and that I wanted to speak to a sergeant. I kept saying words to the effect of, "something's wrong. They're all friends. And now the officer's arresting me."

41. At no point did Officer Koanui or either of the other officers ever tell me I was free to leave.

42. Officer Koanui talked to me several times about not pressing charges. When he, Ms. Griego, and Mr. Myers were talking about how it would be better to not press charges now and just follow-up if we were able to get the video evidence, I didn't agree with them, but they were talking amongst themselves and not talking to me.

43. When they looked at me for my opinion, I told them about how this was setting an example for my son, and that was more important than letting this go. My son had seen me as a victim of domestic violence, and had seen the police do nothing. I wanted him to see me standing up for myself now.

44. Officer Koanui never asked me directly if I wanted to withdraw my complaint against Letoto.

45. I never told Officer Koanui that I didn't want to press charges.

46. Eventually, Sergeant Maioho-Pohina arrived at the Home. However, given the extreme stress caused by both Letoto's assault and Officer Koanui's threats and dismissiveness of me, I fainted soon after she arrived.

47. Later, I called and asked for Sergeant Maioho-Pohina to return to the home.

48. I told Maioho-Pohina that I wanted to write a statement. At this point, I believed that my only option was to write something that would be added to the theft report HPD was preparing against me. My understanding was that no report about Letoto's assault would be prepared.

49. Maioho-Pohina said that she needed to read me my rights, since I was a suspect in a theft case. Although she said that Letoto wasn't going to press charges, I knew that he could change his mind, and that was why Maioho-Pohina still had to read me my rights.

50. Maioho-Pohina left to get the rights form from the police department, and returned to my house to continue our conversation and read the form to me. She did not turn on her body-worn camera when she returned to my house.

51. When Maioho-Pohina started reading through the form, I started crying, and said words to the effect of, "I've got nothing to hide. I've done nothing wrong. All I wanted to do was file charges."

52. I told Maioho-Pohina everything that had happened, including Letoto's assault.

53. From her comments, my understanding was the written statement was to keep *me* from being arrested or prosecuted.

54. When I had composed myself, Maioho-Pohina turned her body camera on, saying that she had "forgotten" to turn it on before.

55. None of the officers ever asked me directly if I wanted to withdraw my complaint against Letoto. None of the officers ever asked me to sign a form stating that I was withdrawing my complaint. I would not have signed such a form because I did not want to withdraw my complaint.

56. Before Maioho-Pohina read me my rights using the form, none of the officers told me I had the right not to speak to them or answer their questions.

57. Each officer at the scene was in full uniform, and their guns and tasers were visible on their belts. Sergeant Maioho-Pohina was in full uniform each time she came to the Home.

58. The day after the incident, I learned that Officer Koanui had actually been my boss because I recognized his photograph on the Exceptional Obedience website.

59. After the incident, I diligently made numerous good faith efforts to obtain copies of any police reports relating to the incident.

60. For over two years, I was told that I could not get a copy of the police report because I was the suspect, and the investigation was "still open."

61. When I told the records department that the complaint had been withdrawn, I learned that the Withdrawal of Complaint form Letoto had signed was not in the file.

62. When I went to the police station to get the police report, I also asked to file my own police report about the assault, but was told that I had to go through Officer Koanui because he had been in charge of the investigation.

63. I decided not to turn in the written statement because I was afraid it would make things worse for me.

64. My understanding was that the statement would just be submitted as part of Letoto's report against me, so I didn't think it mattered whether I submitted it or not. From what Maioho-Pohina had implied, it wouldn't have initiated a report against Letoto anyways.

65. After obtaining the police reports relating to the incident (only after I filed this lawsuit), the only reports that were provided listed me as a suspect, and Letoto as a complainant.

66. No police report exists listing me as a complainant.

67. No police report exists listing "Assault" or "Unauthorized Entry of a Dwelling" or any other potential crime that I alleged Letoto had committed.

68. From the day of the incident, I feared that I might be arrested on the theft charge at any time, which was truly terrifying since I was trying to pursue a criminal case against Letoto. Because I was terrified of going to jail and was afraid that being arrested would affect my ongoing career choice (as an in-home therapist working with families), the threat of arrest dissuaded me from pursuing my criminal case against Letoto.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 2, 2024.

_____
ROBIN HALL