```
 1            IN THE UNITED STATES DISTRICT COURT
 2                       STATE OF HAWAII
 3
 4   ROBIN HALL,                  )CASE NO.CV 21-00248 LEK-KJM
                                  )
 5                  Plaintiff,    )
                                  )
 6       vs.                      )
                                  )
 7   CITY AND COUNTY OF HONOLULU; )
     CHRISTOPHER KOANUI; LEONARD  )
 8   LETOTO; DEBRA MAIOHO-POHINA; )
     JOHN LEO CASTILLO,           )
 9                                )
                    Defendants.   )
10   _____  )
11
12         VIDEOTAPED DEPOSITION OF ROBIN HALL
13   Taken on behalf of the Defendant CHRISTOPHER KOANUI at
14   the Law Offices of Kobayashi Sugita & Goda, LLP, First
15   Hawaiian Center, Suite 2600, 999 Bishop Street,
16   Honolulu, Hawaii 96813, commencing at 9:12 a.m., on
17   Friday, November 1, 2024 pursuant to Notice.
18
19        BEFORE:  MYRLA R. ROMERO, CSR No. 397
20        Notary Public, State of Hawaii
21
22
23
24
25                       Exhibit 1
```

```
 1  APPEARANCES:

 2      For Plaintiff ROBIN HALL:

 3          JONGWOOK "WOOKIE" KIM, ESQ.
            ACLU OF HAWAII FOUNDATION
 4          P.O. Box 3410
            Honolulu, Hawaii 96801
 5          wkim@acluhawaii.org

 6

        For Defendants CITY AND COUNTY OF HONOLULU, JOHN
 7  LEO CASTILLO and DEBRA MAIOHO-POHINA:

 8          WILLIAM R.K. AWONG, ESQ.
            Deputy Corporation Counsel
 9          City and County of Honolulu
            530 S. King Street, Room 110
10          Honolulu, Hawaii 96813
            wawong@honolulu.gov
11

12      For Defendant CHRISTOPHER KOANUI:

13          LEX R. SMITH, ESQ.
            ZACHARY K. SHIKADA, ESQ.
14          Kobayashi, Sugita & Goda
            First Hawaiian Center, 26th Floor
15          999 Bishop Street
            Honolulu, Hawaii  96813
16          lrs@ksglaw.com
            zks@ksglaw.com
17

18      Also present:  GEORGE CORDERO
                       AARON DVORKIAN
19                     JASON MOORE, Videographer

20

21

22

23

24

25
```

1  I N D E X
2
3  EXAMINATION BY:                                    PAGE
4       MR. SMITH...................................5
5       MR. AWONG.................................202
6       MR. SMITH.................................240
7       MR. KIM...................................243
8
9  EXHIBITS MARKED FOR IDENTIFICATION                 PAGE
10 Exhibit 1     Body-worn camera footage of          178
                Sergeant Koanui
11
   Exhibit 2     Body-worn camera footage of          209
12               Sergeant Maioho
13 Exhibit 3     Honolulu Police Department           226
                incident report

1           (Disclosure presented to all counsel.)

2              THE VIDEOGRAPHER:  This is the

3 deposition of Robin Hall in the matter of Robin Hall

4 versus City and County of Honolulu, et al.  We're

5 located at Kobayashi Sugita & Goda, 999 Bishop

6 Street, Suite 2600, Honolulu, Hawaii.  My name is

7 Jason Moore, video specialist for Certified Legal

8 Video Services.  Will the counsel please state your

9 names.

10              MR. SMITH:  Lex Smith, attorney for

11 Christopher Koanui and Zach -- I'm accompanied by

12 Zachary Shikada.

13              MR. KIM:  Jongwook Wookie Kim on

14 behalf of Plaintiff Robin Hall, and I'm companied by

15 Aaron Dvorkian and George Cordero, who are legal

16 staff.

17              MR. AWONG:  Deputy corporation counsel

18 William Awong on behalf of John Castillo and Debra

19 Maioho.

20              THE VIDEOGRAPHER:  Thank you, Counsel.

21 Today is November 1, 2024.  We're on the record at

22 9:12 a.m.  Will the court reporter please swear in

23 the deponent.

24              ROBIN HALL,

25 called as a witness by and on behalf of the Defendant,

1  having been first duly promise to tell the truth, the
2  whole truth and nothing but the truth, was examined and
3  testified as follows:
4                           EXAMINATION
5  BY MR. SMITH:
6       Q    State your full name, please.
7       A    My name is Robin A. Hall.
8       Q    What is your date of birth?
9       A    3/5/69.
10      Q    You have brought with you a rather large
11 fan today.
12      A    Oh, this is.
13      Q    Is that right?
14      A    This is the Dyson we talked about last
15 time.
16      Q    All right.  I'm sorry, I don't remember
17 what we talked about last time, but I need it on the
18 record.  What is it and why have you brought it?
19      A    Oh, this is a Dyson and it makes it helpful
20 for maintaining in a room.
21      Q    Makes it helpful for what?
22      A    Maintaining in a room.
23      Q    I don't understand what you mean by
24 maintaining in a room.  Could you explain, please?
25      A    You have carpet and chemicals, so it makes

1  Q   Oh, okay.  So I had two different things
2  down here.  Holomani Therapy is the place in Kailua?
3  A   Uh-huh.
4  Q   Okay.  So what were, at Exceptional
5  Obedience, were your hours of employment?
6  A   There were no hours to the best of my
7  knowledge.
8  Q   Okay.  Did you -- what were your job duties
9  at Exceptional Obedience?
10 A   Well, he wanted some administrative work
11 done and answering the phones.
12 Q   Is that what you did?  Were those your job
13 duties?
14 A   That is what I did.
15 Q   What administrative work did you do?
16 A   There were two different programs keeping
17 everything scheduled.
18 Q   Right.  Scheduling, what else?
19 A   Okay.  Answering the phone, scheduling the
20 appointments, something along the lines of the board
21 and train.
22 Q   Something along the lines of?
23 A   The board and trains.
24 Q   The board and train?
25 A   Board and train.

96

1  Q   Boarding of dogs.  Is that what you're
2  describing?
3  A   There was boarding of dogs.
4  Q   And training of dogs?
5  A   And there was training, but it was called a
6  board and train.  I don't believe I scheduled a
7  boarding.  I think that was something that he said.
8  Q   Okay.  Anything else, any other duties that
9  you had with Exceptional Obedience?
10 A   Basic admin.
11 Q   Basic admin meaning what did you do?
12 A   Answer phones, scheduling.
13 Q   Okay.  Anything else?
14 A   I can't think of how to clarify at this
15 moment.
16 Q   Where did you perform your functions as an
17 employee of Exceptional Obedience?
18 A   Remotely.
19 Q   Where were you when you performed these
20 duties?
21 A   I don't understand the question.
22 Q   Did you work from home?
23 A   Well, I could have.
24 Q   Where did you work when you performed these
25 duties?

```
1       A    I was remote.
2       Q    So you never went to Exceptional
3  Obedience's premises?
4       A    No.
5       Q    Okay.  How often were you paid?
6       A    Can you ask that differently?
7       Q    Were you paid for performing the
8  administrative and scheduling duties that you did for
9  Exceptional Obedience?
10      A    I can't answer that yes or no.
11      Q    Okay.  Can you explain if you were
12 compensated by Exceptional Obedience?
13      A    Yes.
14      Q    How were you compensated?
15      A    Can you define that?
16      Q    I'd like you to define it.  I'd like to
17 know everything Mr. Letoto and/or Exceptional
18 Obedience gave you for working?
19      A    Okay.  So Mr. Letoto -- you're meaning
20 compensation.  Is that was the question?
21      Q    You asked me to rephrase, and I said I'm
22 asking everything Mr. Letoto gave you for your work
23 at Exceptional Obedience?
24      A    For my work, Exceptional Obedience I was
25 given a cell phone to complete my work.
```

1 Q Right. Mr. Letoto gave you a cell phone?
2 A Mr. Letoto handed me a cell phone.
3 Q And since you worked from home, where were
4 you when you received the cell phone from Mr. Letoto?
5 A I didn't work from home.
6 Q Where did you work when you were -- you
7 said you worked remotely. Where did you work when
8 you were working for Exceptional Obedience?
9 A I worked remotely.
10 Q But not at your house?
11 A Correct.
12 Q Where did you work?
13 A Sometimes at the beach.
14 Q Okay. Where else?
15 A Wherever I happened to be.
16 Q Okay. Where were you when you received the
17 cell phone from Mr. Letoto?
18 A Starbucks.
19 Q Okay. So that was on the first meeting
20 that you had with Mr. Letoto?
21 A That would be correct.
22 Q Did you ever meet with Mr. Letoto again
23 after that first Starbucks meeting?
24 A Yes.
25 Q Where did you meet?

1    Q    When the police arrived, who had the phone?

2    A    When my boss arrived at the door, he

3   informed me that I had it.

4    Q    Did you or not?  I'm just asking for your

5   testimony.

6    A    That's when it was still in the house.  I

7   think it was on the counter.

8    Q    Okay.  So the phone was still in your

9   possession at that time, correct?

10   A    Yeah, it was in the house.

11   Q    Okay.  And did you feel that you were

12  justified in continuing to hold on to the phone?

13            MR. KIM:  Objection.  Vague.  Calls

14  for a legal conclusion.

15            THE WITNESS:  I just kept repeating

16  the same thing.  We were supposed to go to the bank.

17  We agreed to go to the bank.  First he agreed to

18  bring me cash and then we agreed to go to the bank.

19  The phone never came up.

20            MR. AWONG:  Objection.  Nonresponsive.

21            THE WITNESS:  I don't remember the

22  question.

23  BY MR. SMITH:

24   Q    Yeah, my question was whether you felt that

25  you were justified in holding on to the phone?

1           MR. KIM: Same objections.

2           THE WITNESS: Yeah, it's not that I
3  was justified or not. The phone wasn't even party to
4  anything. It was about let's go to the bank.
5  BY MR. SMITH:
6      Q    Well, Mr. Letoto was claiming that you had
7  taken the phone without his consent, right?
8      A    He gave me the phone.
9      Q    Okay. But you had agreed to give it back,
10 right?
11     A    We agreed that he would bring me cash, and
12 then I would give him the phone. It was an end of
13 business, and then we agreed that we would go to the
14 bank and the assumption was made of exchange the
15 phone at the bank. The phone was never mentioned.
16     Q    The phone was never mentioned?
17     A    When he was at the door?
18     Q    So on your oath your testimony today is the
19 phone was never mentioned?
20     A    On my oath when he came to that door, the
21 phone was never mentioned. We were going to the
22 bank. There was never mention of the phone. The
23 only person that mentioned that phone was Officer
24 Koanui. Officer Koanui of Exceptional Obedience, the
25 same man that is the business partner of that man and

176

1  he came to the door and heard what Leonard said.  Can
2  you even imagine?  And all I wanted to do is file
3  charges and no one would let me.  They're sitting
4  there trying to arrest me.
5       Q    Well --
6       A    Do you know how terrifying it is to have
7  the whole police department?  Do you even have a
8  clue?  You don't.  But you know what, we can have a
9  policy because everybody knows what happened.
10 Everybody knows that this was his business partner.
11 Everybody even knew it but me.
12            MR. AWONG:  Objection.  Nonresponsive
13 to the question.
14            THE WITNESS:  And I don't even know
15 what the question was.
16 BY MR. SMITH:
17      Q    Yeah, we can get done more quickly too if
18 we can focus on my questions.
19      A    If I wasn't so upset, it would probably be
20 easier but I guess you don't have an idea of what
21 it's like to be assaulted and a man break into your
22 house and then have the police officer come to your
23 house and you expect to be a police officer and he's
24 not.  He's your boss.  What world does that happen?
25            MR. KIM:  Do you need a break?