UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

| | |
|---|---|
| ROBIN HALL,<br><br>            Plaintiff,<br><br>   vs.<br><br>CITY AND COUNTY OF HONOLULU,<br>CHRISTOPHER KOANUI, LEONARD<br>LETOTO, DEBRA MAIOHO-POHINA,<br>DOE OFFICER 1,  DOE OFFICER 2,<br>JOHN LEO CASTILLO,<br><br>          Defendants. | CIV. NO. 21-00248 LEK-KJM |

**ORDER: GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT;
GRANTING DEFENDANTS DEBRA MAIOHO-POHINA AND JOHN LEO CASTILLO'S
JOINDER IN DEFENDANT CHRISTOPHER KOANUI'S MOTION;
AND DENYING PLAINTIFF'S MOTION FOR
<u>SUMMARY JUDGMENT AGAINST CHRISTOPHER KOANUI</u>**

       Before the Court are the following motions, all of

which were filed on November 22, 2024: Defendants Debra Maioho-

Pohina ("Maioho") and John Leo Castillo's ("Castillo" and

collectively "City Defendants") Motion for Summary Judgment

("City Defendants' Motion"); [dkt. no. 228;] Defendant

Christopher Koanui's ("Koanui") Motion for Summary Judgment

("Koanui's Motion"); [dkt. no. 230;] and Plaintiff Robin Hall's

("Plaintiff" or "Hall") Motion for Summary Judgment Against

Christopher Koanui ("Hall's Motion"), [dkt. no. 232]. On

January 3, 2025, the City Defendants filed a joinder of simple

agreement with Koanui's Motion ("City Defendants' Joinder").

[Dkt. no. 246.] On January 3, 2025, Hall filed her memorandum in opposition to Koanui's Motion and her memorandum in opposition to the City Defendants' Motion. [Dkt. nos. 248, 252.] Also on January 3, 2025, Koanui filed his memorandum in opposition to Hall's Motion. [Dkt. no. 249.] On January 10, 2025, Koanui, the City Defendants, and Hall filed their respective replies in support of their motions. [Dkt. no. 255, 257, 258.]

The motions and the joinder came on for hearing on January 24, 2025. For the reasons set forth below, the City Defendants' Motion, Koanui's Motion, and the City Defendants' Joinder are granted, and Hall's Motion is denied. Summary judgment is granted in favor of the City Defendants and Koanui as to all of Hall's claims.

## BACKGROUND

The instant case arises from a June 10, 2019 incident between Hall and her former boss, Defendant Leonard Letoto ("Letoto"),[1] and the response by Koanui, Castillo, and Maioho,

---

[1] On August 6, 2024, Letoto filed a Notice of Bankruptcy Petition and Automatic Stay of Proceeding. [Dkt. no. 210.] On August 22, 2024, the magistrate judge filed an entering order noting that "[a] stay under 11 U.S.C. § 362 does not automatically apply to other defendants." [EO, filed 8/22/24 (dkt. no. 215) (citing Ingersoll-Rand Fin. Corp. v. Miller Mining Co., 817 F.2d 1424, 1427 (9th Cir. 1987)).] The magistrate judge also informed the parties that he was not inclined to stay the case as a whole unless one of the other parties filed a motion for a stay. [Id.] No party has moved to stay the case pending the completion of Letoto's bankruptcy proceedings.

all of whom are employed by the Honolulu Police Department

("HPD"), to the 911 call that Hall made regarding the incident.

See Third Amended Complaint for Declaratory and Injunctive

Relief and Damages ("Third Amended Complaint"), filed 6/20/23

(dkt. no. 106), at ¶¶ 1-6.

## I.    **Exceptional Obedience**

Hall worked for Exceptional Obedience as a remote

administrative assistant from April 25, 2019 to June 10, 2019.

[City Defs.' Concise Statement of Facts in Support of Motion for

Summary Judgment ("City Defs.' CSOF"), filed 11/22/24 (dkt.

no. 229), at ¶ 1; Plaintiff's Concise Statement of Facts

Supporting Opposition to Defendants Debra Maioho-Pohina and John

Leo Castillo's Motion for Summary Judgment ("Response to City

Defs.' CSOF"), filed 1/3/25 (dkt. no. 253), at pg. 1 (stating

the City Defs.' ¶¶ 1, 10-12, 14-18, and 20 are admitted).]

Koanui and Letoto founded, and were the co-owners of,

Exceptional Obedience, a dog training business. See Plaintiff's

Concise Statement of Facts Supporting Motion for Partial Summary

Judgment Against Christopher Koanui ("Hall's CSOF"), filed

11/22/24 (dkt. no. 233), at ¶¶ 3-4.[2] When Hall worked for

---

[2] The statements of fact in Hall's CSOF are deemed admitted
because Koanui did not file a response to Hall's CSOF. See Local
Rule LR56.1(g) ("For purposes of a motion for summary judgment,
material facts set forth in the movant's concise statement will
be deemed admitted unless controverted by a separate concise
                                          (. . . continued)

Exceptional Obedience, she never met or interacted with Koanui.
[Id. at ¶ 7.] In addition to their business relationship, Koanui
states he and Letoto "are personal friends." See Separate and
Defendant Christopher Koanui's Motion for Summary Judgment
("Koanui's CSOF"), filed 11/22/24 (dkt. no. 231), Declaration of
Christopher Koanui ("Koanui Decl.") at ¶ 9. Hall emphasizes that
"Letoto is 'practically family' to Koanui, and their families
gather and travel together." [Hall's CSOF at ¶ 2.] Hall also
emphasizes that Exceptional Obedience had approximately "twelve
clients who are HPD employees, including Defendant Debra Maioho-
Pohina's son." [Id. at ¶ 5.]

## II. **June 10, 2019 Incident**

On June 10, 2019, Hall and Letoto agreed to end Hall's
employment with Exceptional Obedience. See Koanui's CSOF at ¶ 2;
Plaintiff's Concise Statement of Facts Supporting Opposition to
Defendant Christopher Koanui's Motion for Summary Judgment
("Response to Koanui's CSOF"), filed 1/3/25 (dkt. no. 251), at
¶ 1 (stating Koanui's ¶ 1 is admitted as to that fact). Hall and
Letoto agreed to meet at Hall's residence in Kapolei so that
Letoto could deliver final payment to Hall and Hall could return

---

statement of the opposing party."). However, where the
statements of fact included in Koanui's CSOF indicate a dispute
between Hall and Koanui as to a statement of fact in Hall's
CSOF, the statement of fact in Hall's CSOF will not be deemed
admitted.

the business phone that she had in her possession. See Koanui's
CSOF at ¶¶ 2-3; Response to Koanui's CSOF at pg. 1 (stating
Koanui's ¶¶ 2, 8-11, 18-22, and 29 are admitted); id. at ¶ 3
(admitting that portion of Koanui's ¶ 3).

At approximately 3:44 p.m., Letoto arrived at Hall's
residence, he handed her a check, and they agreed to meet at the
bank to confirm that Hall could cash the check. See Hall's CSOF
at ¶¶ 10-11. Hall and Koanui dispute whether Hall and Letoto
agreed, prior to Letoto's arrival at Hall's residence, that
payment would be made in cash. See Koanui's CSOF at ¶ 3 ("Hall's
claim that they agreed to exchange cash is disputed."); Response
to Koanui's CSOF at ¶ 3 ("The supporting citation from Letoto's
deposition transcript does not dispute that he and Hall had
formed an **agreement** that he would pay her in cash **before** he
arrived at her home." (emphases in original)). Hall's position
is that she was justified in demanding cash because Letoto had
not paid her for the second two-week period that she worked for
Exceptional Obedience, and Letoto had demanded that she be
available to work beyond the two hours per day that he hired her
for. See Hall's CSOF, Declaration of Robin Hall ("Hall Decl.")
at ¶¶ 5-7; see also Response to Koanui's CSOF, Second
Declaration of Robin Hall ("Second Hall Decl.") at ¶¶ 5-7
(stating the same). Hall also states that, while she was working
for Exceptional Obedience, she spoke to a former Exceptional

5

Obedience receptionist who said "Letoto had not paid her despite
providing her with a check," and Hall spoke to a former
Exceptional Obedience client to whom Letoto failed to pay a
refund that the client was owed. [Second Hall Decl. at ¶ 8.]

Hall and Koanui dispute exactly what happened between
Hall and Letoto, but Hall and Koanui agree that, during Hall and
Letoto's discussion at door of Hall's residence, Letoto put his
foot in the doorway and pushed the door into Hall, striking her
hip. See Koanui's CSOF at ¶ 5; Response to Koanui's CSOF at ¶ 5
(admitting that portion of Koanui's ¶ 5). After that, Hall
called 911. See Koanui's CSOF at ¶ 7; Response to Koanui's CSOF
at ¶ 7 (disputing Koanui's ¶ 7 only as to the reason for the 911
call). Hall called 911 at 3:47 p.m. [Hall's CSOF at ¶ 14.]

Hall states she gave the 911 dispatcher Letoto's full
name and Exceptional Obedience's business information, and she
told the dispatcher she was Letoto's receptionist. Hall also
told the 911 dispatcher that she could see Letoto calling
someone. [Second Hall Decl. at ¶ 20.] Hall subsequently she saw
Letoto return to his vehicle – a large, white van - and move it
so that it was blocking her driveway. [Id. at ¶ 23.]

Hall's residence is located within an area that HPD
refers to as District 8, Sector 2. HPD dispatch made an all-
points bulletin ("APB") announcement on the District 8 channel,
stating there was an incident at Hall's residence. At that time,

6

Koanui was working in his capacity as an HPD officer. When
dispatch made the APB announcement, Koanui was the only officer
located in the Kapolei area of Sector 2. See Koanui's CSOF at
¶¶ 8-11; Response to Koanui's CSOF at pg. 1. The officer who was
normally assigned to the area where Hall's residence is located
was on leave. [Koanui's CSOF at ¶ 5; Response to Koanui's CSOF
at ¶ 5 (admitting Koanui's CSOF in part, but noting there was a
court order quashing Hall's subpoena to obtain the HPD duty
roster for the date of the incident).]

Koanui informed dispatch that he would respond to the
APB. See Koanui's CSOF at ¶ 12; Response to Koanui's CSOF at
¶ 12 (disputing Koanui's ¶ 12 only insofar as it suggests
dispatch assigned him to respond). When Koanui learned that
Letoto was involved in the reported incident, he called Castillo
to assist with the response, and Koanui and Castillo arrived at
Hall's residence together. See Koanui's CSOF at ¶¶ 18-19;
Response to Koanui's CSOF at pg. 1. Koanui told Castillo about
his conflict of interest during that call, and Koanui also
called Maioho to tell her about the conflict. See Response to
City Defs.' CSOF at ¶ 92 (citing Hall's CSOF, Exh. 9 (dkt. no.
233-10, Koanui's Response to Plaintiff's First Set of Interrogs.
to Christopher Koanui ("Koanui's Responses to Interrogs.")) at

7

No. 14).[3] Castillo was a junior officer to Koanui, and Castillo was working in a different sector and beat. [Id. at ¶ 24 (citing Hall's CSOF, Exh. 10 (dkt. no. 233-11, excerpts of trans. of 11/30/23 Videotaped Deposition of Christopher Koanui ("Koanui Depo.")) at 130:12-133:18, 88:10-89:17).[4]] Maioho testified during her deposition that she instructed Koanui not to be the initial officer on the scene and to have Castillo handle the situation. [Hall's CSOF at ¶ 28 (citing Hall's CSOF, Exh. 16 (dkt. no. 233-17, excerpts of trans. of 10/30/24 Deposition of Debra Ann Maioho ("Maioho Depo.")) at 29:5-31:3, 41:2-45:14).]

Castillo's account differs from Koanui's. Castillo states he went to Hall's residence in response to HPD dispatch's

---

[3] Hall's Response to City Defendants' CSOF includes Plaintiff's Additional Concise Statement of Facts, which incorporates facts 1-64 in Hall's CSOF, incorporates facts 65-91 in the additional facts section of Hall's Response to Koanui's CSOF, and states additional facts 92-137. See Response to City Defs.' CSOF at pgs. 2-5. The City Defendants' reply was not accompanied by a responsive statement of facts to Hall's additional facts.

[4] The Court notes that none of the exhibits attached to Hall's CSOF are authenticated. Further, Hall has not included the court reporter's certificates for the deposition transcripts she has submitted. This does not automatically preclude consideration of Hall's exhibits. See David v. Betts, 734 F. Supp. 3d 1050, 1078 n.20 (D. Hawai`i 2024) (stating that Federal Rule of Civil Procedure 56 "mandates only that the substance of the proffered evidence would be admissible at trial" (brackets, citation, and quotation marks omitted)). However, Hall's counsel is cautioned that the better practice is to authenticate all exhibits and include the court reporter's certificate for any transcript.

APB, and he arrived at Hall's residence at approximately the same time as Koanui. [City Defs.' CSOF, Declaration of John Castillo ("Castillo Decl.") at ¶¶ 2-3.] The Castillo Declaration does not include any reference to Koanui calling Castillo to ask for his assistance.

Koanui states the initial APB announcement did not include any names and stated the 911 caller reported that her boss was trying to break into her house. [Koanui Decl. at ¶ 5.] Hall does not dispute this. See Hall's CSOF at ¶ 17 ("Koanui heard an HPD dispatcher APB about a 'threatening' incident with 'the caller stating that her boss was trying to break into her house.'"). Thus, Koanui states that, when he informed dispatch he would respond, he did not know the reported incident involved Letoto, and he did not know who Hall was. [Koanui Decl. at ¶¶ 7-8.] According to Koanui, he learned that Letoto was involved in the reported incident through an update that HPD dispatch provided later. [Id. at ¶ 10.]

At his deposition, Koanui was asked if he considered whether he should recuse himself instead of responding to the APB because of his connection with one of the parties involved in the reported incident. [Koanui's CSOF, Declaration of Counsel ("Smith Decl."), Exh. B (dkt. no. 231-4, Koanui Depo.) at 137.] Koanui said he did not consider recusing himself because there was not "a large pool of officers to respond" if he did not

9

respond to the APB. [Id.] Further, because the 911 call reported a potential break-in, Koanui was required to respond, in spite of any conflict, "because if this is an active case, we have to make the scene safe, and that would mean making sure that [the caller] wasn't getting attacked, none of the property was being damaged." [Id.] Hall points out that Koanui was concerned about how the criminal allegations against Letoto would impact Exceptional Obedience. See Hall's CSOF at ¶ 21.

Koanui testified that, on the date of the incident, before Hall's 911 call, Koanui and Letoto spoke on the phone, and Letoto informed Koanui that Letoto had hired an assistant but that Letoto was terminating her employment for unsatisfactory performance. Letoto did not mention the assistant's name during that call. See Smith Decl., Exh. B (dkt. no. 231-4, Koanui Depo.) at 118-19, 136. Koanui testified that, after he heard the dispatch update, but before meeting Castillo to go to Hall's residence, Koanui called Letoto and asked where Letoto was. Letoto responded that she took his phone and was refusing to return it until she got cash. Letoto did not provide a name, but Koanui assumed Letoto was referring to the assistant whose employment was being terminated. At that point, Koanui knew that the 911 caller referred to in the APB announcement was the woman who was having a dispute with Letoto. [Id. at 135-37.]

10

Hall disagrees with Koanui's testimony and alleges
"Koanui spoke to Letoto about the details of the dispute with
Hall before informing Dispatch he would respond." See Response
to Koanui's CSOF at ¶ 13-17 (citing Hall's CSOF at ¶¶ 14, 17,
19). Hall's CSOF paragraph 14 states: "While Hall was calling
911, at 3:47pm, [sic] Letoto called Koanui on Koanui's personal
phone to inform him, 'as a partner' in the business, about
Hall's 'resistance or refusal' to give back their phone."
[Hall's CSOF at ¶ 14 (citing Hall's CSOF, Exh. 22 (video file
from Hall's home security system) at 01:40-01:44; Hall's CSOF,
Exh. 15 (dkt. no. 233-16, excerpts of transcript of 12/15/23
Videotaped Deposition of Leonard Letoto ("Letoto Depo.")) at
40:16-41:3, 56:19-58:16 and 64:6-66:11).] Hall's CSOF ¶ 17
states: "After Letoto informed Koanui about the situation at
[Hall's residence], Koanui heard an HPD dispatcher APB about a
'threatening' incident with 'the caller stating that her boss
was trying to break into her house.'" [Id. at ¶ 17 (citing
Hall's CSOF, Exh. 10 (dkt. no. 233-11, Koanui Depo.) at 120:8-
122:11, Exh. 15 (dkt. no. 233-16, Letoto Depo.) at 58:4-20).]
Hall's CSOF ¶ 19 states: "Before arriving at [Hall's residence],
Koanui called Letoto, who gave him enough 'details' to know that
the Incident in fact involved his own close friend and business
partner and his own employee." [Id. at ¶ 19 (citing Hall's CSOF,
Exh. 10 (dkt. no. 233-11, Koanui Depo.) at 135:10-137:9, and

138:10-15).] In spite of Koanui's failure to file a responsive
CSOF, these statements in Hall's CSOF are not deemed admitted
because there is clearly a dispute between the facts as Hall
relates them and Koanui's declaration and deposition testimony.

Koanui and Castillo arrived at Hall's residence at
4:07 p.m. At that time, Letoto was standing by his van, which
was blocking Hall's driveway. Koanui did not speak to Letoto,
even though Letoto was the suspect in the 911 call they were
responding to. [Hall's CSOF at ¶¶ 30-32.] Koanui admitted that
he normally would have identified and detained the suspect until
the completion of the investigation, but he treated Letoto
differently because of their preexisting relationship. Koanui
also explained that Castillo detained Letoto. [Id. at ¶¶ 33-35.]
However, when Koanui and Castillo arrived at Hall's residence,
they went directly to the front door, and neither had contact
with Letoto. [Id. at ¶¶ 36, 38.]

According to Castillo, soon after he and Koanui
arrived at Hall's residence, they "divided the investigative
responsibilities; Officer Koanui stayed inside with Plaintiff
and [Castillo] went outside to talk to Letoto." [Castillo Decl.
at ¶ 6.] Hall argues Castillo did not have a conversation with
Koanui at her residence, and thus Koanui and Castillo did not
discuss the division of responsibilities. Hall contends Koanui
and Castillo were working together. [Response to City Defs.'

CSOF at ¶ 8 (citing Response to City Defs.' CSOF at ¶¶ 94-96).]
Hall argues the video footage from Castillo's body-worn camera
("BWC") shows that Castillo and Koanui did not talk to each
other when they arrived at her residence, and that they did not
talk to Letoto, who was standing at the end of her driveway.
Castillo followed Koanui up the driveway to the front door.
[Response to City Defs.' CSOF at ¶¶ 94-96 (citing Castillo BWC
at 0:00-00:26).[5]] Before Castillo left to talk to Letoto,
Castillo heard Hall describe the incident to Koanui. [Id. at
¶¶ 97-99 (citing Castillo BWC at 00:24-00:34, 00:35-00:48,
02:20).]

        When Hall opened the door for Koanui, with Castillo
standing behind him, Koanui asked Hall what was going on, and
Koanui told her that he had already heard Letoto's account of
what happened, *i.e.*, that there was a business cellular phone
and she received a final paycheck, but she did not want to give
the phone to Letoto until she cashed the paycheck. The following
is Hall's description of the incident. Letoto was supposed to
bring her cash, and she told him she would go the bank, cash the
check, and then give back the phone. She started to close the
door to get her things, but Letoto tried to force his way

_____

    [5] Castillo's BWC video footage is Exhibit 19 to Hall's CSOF.
It is also the City Defendants' Exhibit C.

13

inside. While he was doing so, the door handle hit Hall, and she said she had a bruise. Letoto threatened to come in. After Hall recounted her description of the incident, Koanui asked Hall if she wanted an ambulance, and she declined,[6] but Hall said she wanted to press charges. Hall and Koanui then went into another area of the house to try to view Hall's home security camera footage. Castillo stayed closer to the doorway, spoke briefly to Hall's teenage son, and then went outside and asked Letoto for identification. [Castillo BWC at 00:18-03:02.]

When Koanui went with Hall into the other area of the residence, Mike Myers ("Myers"), Hall's landlord, and Iris Griego ("Griego") were also present. See, e.g., Koanui BWC at 2:00-05:32;[7] see also Second Hall Decl. at ¶¶ 21, 38. Griego is a realtor who came to Hall's residence with Myers to get paperwork. See Koanui BWC at 23:19-23:24.

Hall showed Koanui her injuries and explained that Letoto had attempted to break into her residence and that he assaulted her by slamming the front door into her. When Koanui arrived at Hall's residence, Hall still had the Exceptional

---

[6] Hall later requested an ambulance. [Koanui BWC at 04:52-04:56, 05:27-05:31.] Koanui called in a request for the ambulance to address Hall's report of pain to her hip. [Id. at 05:45-05:51.]

[7] Koanui's BWC video footage is Exhibit 18 to Hall's CSOF. It is also Koanui's Exhibit A.

Obedience phone and her paycheck in her possession. [Koanui's
CSOF at ¶¶ 20-21; Response to Koanui's CSOF at pg. 1.] Koanui
was not able to see any of the video footage of Hall's
interaction with Letoto. See Koanui's CSOF at ¶ 22; Response to
Koanui's CSOF at pg. 1.

Hall argues Koanui interrupted her while she was
trying to give an oral statement, he did not ask how she was
doing, except to express doubt about whether she had actually
sustained a bruise to her hip. [Hall's CSOF at ¶¶ 39-43.] She
also emphasizes that Koanui admitted that, while he was at
Hall's residence, he had all of the elements for an assault
charge, and Hall never retracted her statement that she wanted
to press charges against Letoto. [Id. at ¶¶ 48-49.]

While Castillo was still near the door, he asked
Koanui, "do you want me to stay with him," which Hall argues
referred to Letoto. [Id. at ¶ 37.] Koanui responded, "no, he's
fine," and a little while after that, Castillo walked out and
spoke to Letoto on his own. [Id.]

Castillo states that, during his conversation with
Letoto outside of Hall's residence, he learned that Koanui and
Letoto owned a dog training business together. [Castillo Decl.
at ¶ 7.] Hall argues the evidence shows that, when Castillo
interviewed Letoto, Castillo already knew about Koanui and
Letoto's connection. [Response to City Defs.' CSOF at ¶ 9

15

(citing Hall's CSOF at ¶¶ 24-26; Response to City Defs.' CSOF at ¶ 92).] Hall points out that: when Castillo interviewed Letoto, Castillo did not respond when Letoto said he was Koanui's business partner; and Castillo did not ask Letoto any questions about the assault that Hall reported in the 911 call. See id. at ¶¶ 100-01.

Meanwhile, inside of Hall's residence, Koanui asked to see Hall's bruise and, after Hall complied, he stated that the area might be tender, but he did not see a bruise. [Koanui BWC at 02:12-02:18.] When they discussed the return of Letoto's business phone, Koanui told Hall that her refusal to return the phone was "borderline extortion" and could constitute a class B felony based on the probable value of the phone. [Id. at 03:20-04:05.] He also stated: "So I wanna make sure that nobody's gonna get unnecessarily arrested for anything." [Id. at 4:30-4:55.]

Koanui told Hall, Hall's son, Myers, and Griego to continue to work on accessing the security footage while he went outside to question Letoto. Koanui also said he would return with statement forms for Hall and her son to complete. He then exited the residence. [Koanui BWC at 12:30-12:59.]

Hall points out that, after Koanui spoke with Hall in the residence and Castillo spoke to Letoto outside, Koanui told Castillo that Hall was saying Letoto tried to push open her door

16

to break into the house. Castillo responded that the situation
was going to be a mess. <u>See</u> Response to City Defs.' CSOF at
¶ 102 (citing Castillo BWC at 12:40).

Hall argues that, when Koanui told Castillo that
Sergeant Sanchez ("Sanchez") instructed them to document Hall's
assault complaint,[8] "Castillo scoffed." <u>See</u> <u>id.</u> at ¶ 103 (citing
Castillo BWC 26:24). However, when Koanui said they were going
to get Hall started on a form, Castillo responded "okay." <u>See</u>
Castillo BWC at 26:25-26:27. Koanui also told Castillo that Hall
wanted Letoto to be arrested. [Koanui BWC at 26:34-26:38.]
Koanui told Castillo, "we're gonna just CYA,"[9] and he instructed
Castillo to get a statement from Hall while Koanui read Letoto
his rights and took Letoto's statement. [Castillo BWC 27:24-
27:32.] Prior to that, while on the phone with Sanchez, Koanui
stated "we're goin' jus do the assault third CYA and then uh
make the case and then forward it." [Castillo BWC 27:05-27:10.]
Hall emphasizes that Koanui did not document her assault
complaint as Sanchez had instructed him to do. [Response to
Koanui's CSOF at ¶ 59.]

---

[8] Before calling Sanchez, Koanui attempted to call Maioho,
but she did not answer her phone. [Koanui BWC at 19:44-19:46
(Koanui explaining to Sanchez why he called).]

[9] "CYA" presumably refers to "cover your ass."

When Koanui went back inside the residence, he explained to Hall that, based on what Letoto told the officers, they had a theft case, and based on what Hall told the officers, they had an assault case. The officers were going to fill out cross-complaints, and both Hall and Koanui would be suspects. Griego told Koanui to hold on and to let her talk to Hall to see if they could resolve the situation. Koanui said he and Castillo would wait outside until Hall and Griego were done talking. Koanui and Castillo then exited the residence. As they were walking out, Castillo told Koanui that Hall called for a sergeant to come to the residence. [Koanui BWC at 29:04-31:20.]

Shortly thereafter, Griego went outside and had a conversation with Koanui and Letoto about how the matter could be resolved and what the consequences could be if charges were brought. During that conversation, Letoto stated that, if Hall pressed charges against him, he would press charges against her. Griego later went back inside the residence to talk to Hall again. [Id. at 33:26-38:50.]

A few minutes later, Koanui went back inside the residence and asked Hall and Griego if they have decided what they were going to do. After Hall repeated her account of the incident between her and Letoto, Koanui pointed out that there were inconsistencies between what Hall just said and what Hall said when Koanui first arrived at the residence. Griego said

18

they were thinking about letting the matter go. Koanui said he
thought that would be best for everyone, but he could not compel
them to do that. Hall did not object to or contradict Griego's
statement. [Id. at 41:13-43:10.] Myers then suggested to Hall
that she let the officers go, and he pointed out that she could
file a report later if necessary, and she could pursue a civil
action if her final paycheck did not cash. Koanui said that,
because the alleged offenses were both misdemeanors, no one was
going to jail and no one was getting arrested. Koanui also said
that, if Hall chose to make a case, the prosecutors would review
the case and then decide whether to prosecute. The group also
discussed when information about arrests and convictions is
available to the public. Myers told Hall that, if she wanted to
pursue criminal charges against Letoto and they could get the
security camera footage, then that would be the route to go.
Koanui then said, at that time (when they were unable to access
the security camera footage), the case would be based solely on
Hall's statement. [Id. at 43:18-47:08.]

        After that conversation, the ambulance arrived, and
emergency medical technicians ("EMTs") began their evaluation of
Hall. [Id. at 48:13-48:46.] As discussed below, Hall
subsequently fainted, and Koanui did not speak to her again.

        Hall states:

> Throughout Officer Koanui's time at the scene, he
> attempted to persuade me not to press charges. He
> used a coercive and intimidating tone. I felt
> threatened not to press charges. Officer Koanui
> made it clear that HPD already had a legitimate
> case against me for theft of the phone, and that
> I would be arrested if I made a cross complaint
> against Letoto. He also insinuated that Letoto
> had been justified in assaulting me and breaking
> into my house to recover his property. He also
> stood in front of me with a wide stance and
> talked authoritatively.

Second Hall Decl. at ¶ 27; see also Response to Koanui's CSOF at

¶ 56 (citing Koanui BWC 29:22-30:10, 43:00-43:18). According to

Hall, "Koanui invoked the idea that [she] had committed

'extortion' a dozen times." [Response to Koanui's CSOF at ¶ 54

(citing Koanui BWC 3:30-3:45, 11:35-12:00, 17:25-18:00, 19:45-

21:00, 22:10-22:37, 23:55-24:13, 29:10-29:27, 33:00-33:35,

37:38-38:05).]

Koanui denies physically threatening Hall or placing

Hall under arrest. [Koanui's CSOF, Declaration of Christopher

Koanui ("Koanui Decl.") at ¶¶ 16-17.] Hall argues that, while at

her residence, Koanui told others that he threatened Hall with

arrest. [Response to Koanui's CSOF at ¶ 55 (citing Koanui BWC

37:45-38:00).] However, what Koanui said was that, when he

discussed the possibility of extortion or theft charges with

Hall, "she didn't really seem too receptive to the idea that she

could possibly be arrested or something." [Koanui BWC at 37:45-

38:00.]

A.    __Maioho's Arrival__

On June 10, 2019, Maioho was on-duty and was the
District 8, Sector 2 sergeant. [City Defs.' CSOF, Declaration of
Debra Maioho ("Maioho Decl.") at ¶ 2.]

At some point during the investigation by Koanui and
Castillo, Hall called 911 and requested that an HPD supervisor
come to her residence. After that 911 call, Maioho went to
Hall's residence. When she arrived, Maioho conferred with Koanui
about the facts and circumstances. [City Defs.' CSOF at ¶¶ 10-
12; Response to City Defs.' CSOF at pg. 1.] Dispatch sent Maioho
to Hall's residence at approximately 4:35 p.m. [Maioho Decl. at
¶ 3.] Hall argues Maioho "seem[ed] unsurprised Koanui was the
lead on the case." [Response to City Defs.' CSOF at ¶ 105
(citing Castillo BWC 57:09).]

Maioho entered Hall's residence to speak with Hall
about how she wanted to proceed, but soon after Maioho entered,
Hall fainted, and the investigation could not proceed. Maioho
instructed Koanui to prepare an Injured Care For ("ICF") report,
and she instructed Castillo to obtain a withdrawal of complaint
from Letoto. Maioho also told Hall's family to have Hall call
her when Hall recovered. City Defs.' CSOF at ¶¶ 14-16; Response
to City Defs.' CSOF at pg. 1; see also, e.g., Castillo BWC at
1:01:57-1:01:59 (Castillo asks Koanui what happened, and Koanui
responds "she just collapsed").

After Hall fainted and the EMTs examined her, Castillo told Letoto that they would take a verbal statement and Castillo asked Leoto whether Leoto wanted to press charges for the theft of the phone, which had been returned to him.[10] After a discussion about the value of the phone, Koanui and Castillo had Leoto sign an HPD 172 form, indicating that he was withdrawing his theft complaint, but Koanui said Leoto could "always change it later." [Castillo BWC at 1:12:37-1:14:34.] Koanui told Leoto that the last thing Hall had told him on camera was that she was not going to press charges. Koanui said "we're just gonna CYA," and "at least that covers that we have that documentation." [Id. at 1:14:48-1:15:12.] Leoto leaves the scene after the form was complete. [Id. at 1:15:34-1:15:44.]

Castillo states he never spoke directly to Hall, and Hall did not ask him to file a report for her. Castillo also states he never heard Koanui deny Hall the right to file a report. [Castillo Decl. at ¶¶ 9-10.] Hall emphasizes that Castillo's BWC footage shows that Castillo was present when she said she wanted to press charges against Leoto. [Response to Koanui's CSOF at ¶ 50 (citing Castillo BWC 0:00-1:25).]

---

[10] While Koanui was on the phone with Sanchez, Griego came out of the residence with the Exceptional Obedience phone, and Koanui instructed Griego to give it to Leoto. [Koanui BWC at 22:38-22:46.]

Hall also argues that, while she was being treated by EMTs after she fainted, "Koanui also persuaded Maioho-Pohina that Hall did not have a legitimate complaint." [Id. at ¶ 60 (citing Koanui BWC 1:02:16-1:05:16; Maioho-Pohina BWC 1:20-3:48).[11]] Further, when Maioho left the residence, Koanui told Maioho "last I got is, she didn't wanna press charges." [Koanui BWC 1:18:35-1:19:05.]

**B.   Maioho's Return to the Residence**

Maioho returned to Hall's residence in the evening on June 10, 2019 and asked Hall how she wanted to proceed. Hall said she wanted to make a statement to preserve her side of the story. [City Defs.' CSOF at ¶¶ 17-18 (first); Response to City Defs.' CSOF at pg. 1.[12]] Maioho provided Hall with a form to use to write out her statement, and Maioho said that, even though Letoto was not pressing charges, Hall would have to be informed of her constitutional rights. City Defs.' CSOF at ¶ 18 (second); Response to City Defs.' CSOF at ¶ 18 (disputing the second ¶ 18

---

[11] Hall's Exhibit 20 is the BWC video footage from the first time that Maioho went to Hall's residence on June 10, 2019.

[12] The City Defendants' CSOF has two paragraphs numbered 18. See City Defs.' CSOF at pg. 3. Hall admits one and admits the other in part. See Response to City Defs.' CSOF at pg. 1. Based on Hall's explanation of the reasons why one paragraph 18 is only admitted in part, it appears that Hall admits the City Defendants' first paragraph 18 and admits their second paragraph 18 in part.

to point out that Hall believed her statement was in rebuttal to
Letoto's complaint and that HPD would not file her complaint
against Letoto); see also Second Hall Decl. at ¶ 53 (stating
that, based on what Maioho said, Hall believed the purpose of
the statement was to prevent Hall's arrest or prosecution).
Maioho had to go back to the Kapolei Police Station to get the
constitutional rights acknowledgment form, and Hall remained at
the residence working on her statement. See City Defs.' CSOF at
¶ 19; Response to City Defs.' CSOF at ¶ 19 (disputing other
terminology).

     Hall adds that she described the assault by Letoto to
Maioho, and she told Maioho "I get the idea that [Koanui] was
making these threats and they would make those charges on me so
I wouldn't press charges that [Letoto] was breaking into the
house. And I know that Leonard [Letoto] was good friends with
one of the cops that were out there. I know that." [Response to
City Defs.' CSOF at ¶ 109 (citing Maioho BWC2 at 04:10-04:35).[13]]
Maioho did not respond. [Id. at ¶ 110 (citing Maioho BWC2 at
04:10-04:35).]

     When Maioho returned to the residence to go over
Hall's constitutional rights, Hall had not completed her

---

[13] Maioho's BWC video footage from the second time she went
to Hall's residence ("Maioho BWC2") is the City Defendants'
Exhibit E.

statement. [City Defs.' CSOF at ¶ 20; Response to City Defs.'
CSOF at pg. 1.] Maioho left the statement form with Hall and
told her how to submit it when it was complete. [City Defs.'
CSOF at ¶ 21; Response to City Defs.' CSOF at ¶ 21 (admitting
the City Defendants' ¶ 21 in part and pointing out that Maioho
told Hall to submit the form at Hall's convenience).] Maioho
states she did not arrest Hall or threaten Hall with arrest.
[City Defs.' CSOF, Declaration of Debra Maioho ("Maioho Decl.")
at ¶ 16.]

Hall points out that Maioho said Hall's statement
would be added to the report that had been completed. [Response
to City Defs.' CSOF at ¶ 113 (citing Maioho BWC3 at 01:55).[14]]
Maioho did not tell Hall that a separate report would be filed
regarding the alleged assault by Letoto. [Id. at ¶ 114 (citing
Maioho BWC2, BWC3).] Hall ultimately did not complete the
statement form because she believed it might hurt her with
regard to Letoto's complaint against her. Further, based on what
Maioho told her, Hall believed her statement would be
incorporated into the report regarding Letoto's complaint
against her, and it would not have prompted a report against
Letoto for the alleged assault. [Second Hall Decl. at ¶¶ 63-64.]

---

[14] Maioho's BWC video footage from the third time she went
to Hall's residence ("Maioho BWC3") is the City Defendants'
Exhibit F.

Hall states that, when Maioho started going over the
constitutional rights form with her, Hall "started crying, and
said words to the effect of, 'I've got nothing to hide. I've
done nothing wrong. All I wanted to do was file charges.'" [Id.
at ¶ 51.] Hall repeated to Maioho what happened during the
incident, including Letoto's alleged assault, and then Hall had
to regain her composure. See id. at ¶¶ 52, 54. After that,
Maioho turned her BWC on. Maioho said she had forgotten to turn
it on earlier. [Id. at ¶ 55.]

Hall states she was never asked whether she wanted to
withdraw her complaint against Letoto, and she would not have
done so if she had been asked. See id. All of the officers who
responded to Hall's residence were in uniform with their guns
and tasers visible. Before Maioho went over the constitutional
rights form with Hall, none of the officers advised Hall that
she had a right to decline to speak to them. [Id. at ¶¶ 56-57.]

The HPD report for the incident consists of reports
prepared by Castillo, Koanui, and Maioho. See Smith Decl.,
Exh. K (dkt. no. 231-13, Honolulu Police Department Incident
Report No. 19-218923 ("HPD Report No. 19-218923")).[15] Castillo's
report includes a statement by Letoto. See id. at PageID.2668-

---

[15] HPD Report No. 19-218923 is also the City Defendants'
Exhibit B, [dkt. no. 229-4,] and Hall's Exhibit 1, [dkt.
no. 233-12].

70. Maioho states: "At no point during the investigation did I
conspire, agree, or otherwise work together with Officer Koanui
or Officer Castillo to violate Plaintiff's rights or to resolve
the situation in Letoto's favor." [Maioho Decl. at ¶ 5.]
Castillo makes a similar statement. See Castillo Decl. at ¶ 5.

## III. <u>Subsequent Events</u>

At some point, Hall went to the emergency room, and
she states a physician diagnosed her with a contusion on her
hip. Hall states she limped for two to two and a half weeks
after the incident. [Second Hall Decl. at ¶ 18.]

The day after the incident, Hall recognized a
photograph of Koanui on the Exceptional Obedience website. [<u>Id.</u>
at ¶ 58.]

For more than two years after the incident, Hall
attempted to obtain a copy of any HPD reports related to the
incident, but she was told that she could not obtain a copy
because the investigation was still open and she was the
suspect. When Hall told the HPD records department that Letoto's
complaint had been withdrawn, Hall learned that Letoto's form
withdrawing his complaint was not part of the incident file.
[<u>Id.</u> at ¶¶ 59-62.] During her attempts to obtain the police
report, Hall asked if she could make her own report about the
assault by Letoto, but she was referred to Koanui. [<u>Id.</u> at
¶ 62.] Hall ultimately obtained the police reports about the

27

incident after she filed the instant case. The only report lists Letoto as the complainant, and there is no report where Hall is the complainant about the assault or unauthorized entry that she alleged Letoto committed. [Id. at ¶¶ 65-67.]

> Hall states:
>
> From the day of the incident, I feared that I might be arrested on the theft charge at any time, which was truly terrifying since I was trying to pursue a criminal case against Letoto. Because I was terrified of going to jail and was afraid that being arrested would affect my ongoing career choice (as an in-home therapist working with families), the threat of arrest dissuaded me from pursuing my criminal case against Letoto.

[Id. at ¶ 68.]

## IV.    **Relevant Procedural Background**

Relevant to motions currently before this Court, Hall alleges the following claims:

-a Title 42 United States Code Section 1983 claim against Koanui, Castillo, and Maioho (collectively "Officer Defendants"), alleging violation of Hall's First Amendment right to petition the government to seek redress of grievances ("Claim 1");

-a Section 1983 claim against the Officer Defendants, alleging retaliation in violation of Hall's First Amendment rights ("Claim 2");

-a Section 1983 claim against Koanui and Castillo, alleging false arrest and imprisonment in violation of Hall's Fourth Amendment rights ("Claim 3");

-a Section 1983 claim against the Officer Defendants, alleging malicious abuse of process in violation of Hall's Fourteenth Amendment rights ("Claim 4");

-a Section 1983 claim against the Officer Defendants, alleging violation of Hall's Fourteenth Amendment equal protection rights ("Claim 5");

-a Section 1983 claim against the Officer Defendants and Letoto (all collectively "Defendants"), alleging conspiracy to interfere with Hall's civil rights ("Claim 6");

-an intentional infliction of emotional distress ("IIED") claim against Defendants ("Claim 10"); and

-a civil conspiracy claim against Defendants ("Claim 11").

[Third Amended Complaint at pgs. 46-55, 62-63.]

Hall's claims against Maioho in Claims 1, 3, and 5 have been dismissed with prejudice, as has the portion of Claim 2 alleging a First Amendment retaliation claim against Maioho based upon the alleged arrest of Hall in Hall's residence before Maioho arrived. See Order Granting in Part and Denying in Part Defendants Debra Maioho-Pohina and John Leo Castillo's Motion to Dismiss Third Amended Complaint, filed 3/29/24 (dkt. no. 184) ("3/29/24 Order"), at 47.[16] In addition, Hall's claims against the City Defendants in Claim 4 have been dismissed with prejudice. See 3/29/24 Order, 2024 WL 1348635, at *14. This Court ruled that the City Defendants were entitled to qualified immunity as to those claims. See id. at *12-15.

The City Defendants seek summary judgment in their favor as to Hall's remaining claims against them, [City Defs.' Motion at 2,] and Koanui seeks summary judgment as to all claims

---

[16] The 3/29/24 Order is also available at 2024 WL 1348635.

against him by Hall, [Koanui's Motion at 1-2]. Hall seeks

summary judgment against Koanui as to Claims 1, 2, and 5.

[Hall's Motion at 1.]

**DISCUSSION**

I.    **Federal Claims**

Claims 1 through 6 allege Section 1983 claims.

The elements of a Section 1983 claim are:
"(1) a person acting under color of State law;
(2) subjects or causes to be subjected to
deprivation; (3) a U.S. citizen or person in the
jurisdiction of the United States; (4) of a
right, privilege, or immunity secured by the
Constitution and laws." Chaudhry v. Aragón, 68
F.4th 1161, 1169 & n.9 (9th Cir. 2023). . . .

3/29/24 Order, 2024 WL 1348635, at *4. The first and third

elements are not at issue in the parties' motions. To establish

the second element,

["]the plaintiff must . . . demonstrate that the
defendant's conduct was the actionable cause of
the claimed injury." Harper v. City of Los
Angeles, 533 F.3d 1010, 1026 (9th Cir. 2008).
Such causation "can be established" either "by
some kind of direct personal participation in the
deprivation" or "by setting in motion a series of
acts by others which the actor knows or
reasonably should know would cause others to
inflict the constitutional injury." Gini v. Las
Vegas Metro. Police Dep't, 40 F.3d 1041, 1044
(9th Cir. 1994) (quoting Merritt v. Mackey, 827
F.2d 1368, 1371 (9th Cir. 1987)). "To meet
[§ 1983's] causation requirement, the plaintiff
must establish both causation-in-fact and
proximate causation." Harper, 533 F.3d at
1026 . . . . "Without [such] caus[ation], there
is no section 1983 liability." Van Ort v. Est. of
Stanewich, 92 F.3d 831, 837 (9th Cir. 1996).

Chaudhry, 68 F.4th at 1169–70 (some alterations in Chaudhry)
(footnote omitted).

> **A.    Claim 1 – First Amendment Violation**

Claim 1 alleges Koanui and Castillo "infringed upon
Plaintiff's First Amendment rights by not allowing her to file a
report against Defendant Letoto . . . ." [Third Amended
Complaint at ¶ 172.]

This Court has ruled that the filing of a criminal
complaint is protected by the First Amendment. See 3/29/24
Order, 2024 WL 1348635 at *5 (citing Entler v. Gregoire, 872
F.3d 1031, 1043 (9th Cir. 2017)). Further,

> [t]he First Amendment protects the right of an
> individual to petition the government for redress
> of grievances. Borough of Duryea, Pa. v.
> Guarnieri, 564 U.S. 379, 382 (2011); Smith v.
> Ark. State Highway Emps., Local 1315, 441 U.S.
> 463, 464 (1979) (per curiam). "But this right is
> uni-directional; it does not require government
> officials . . . to respond, or even listen, to
> citizens." Rodriguez v. Newsom, 974 F.3d 998,
> 1010 (9th Cir. 2020); Smith, 441 U.S. at 465; see
> also L.F. v. Lake Wash. Sch. Dist. #414, 947 F.3d
> 621, 626 (9th Cir. 2020) ("[T]he First Amendment
> does not compel the government to respond to
> speech directed toward it."). Accordingly, any
> alleged failure to adequately investigate
> Plaintiff's complaint did not violate Plaintiff's
> First Amendment rights. Smith, 441 U.S. at 465;
> see also Douglas v. Kalanta, 2024 WL 1795160, *3
> (9th Cir. 2024) (affirming sua sponte dismissal
> of civil rights claim against police department
> due to an alleged "botched investigation" because
> "the right to petition in the First Amendment
> . . . does not impose an affirmative obligation
> on the government to consider, respond to, or
> grant any relief on a citizen's petition for

31

redress of grievances"), *pet. for cert. filed*,
(Aug. 19, 2024); Trentadue v. Integrity Comm.,
501 F.3d 1215, 1237 (10th Cir. 2007) ("[T]he
right to petition confers no attendant right to a
response from the government."); Mitchell v.
McNeil, 487 F.3d 374, 378 (6th Cir. 2007) ("There
is no statutory or common law right, much less a
constitutional right, to an investigation");
Apple v. Glenn, 183 F.3d 477, 479 (6th Cir. 1999)
(per curiam) ("A citizen's right to petition the
government does not guarantee a response to the
petition or the right to compel government
officials to act on or adopt a citizen's
views."); Page v. Stanley, 2013 WL 2456798, *9
(C.D. Cal. 2013) ("Plaintiff exercised his
constitutional right to petition the government
by filing a citizen's complaint. The exercise of
that right did not trigger an obligation under
the federal Constitution for [the defendants] to
consider or investigate Plaintiff's claims or to
provide any response to Plaintiff. Therefore,
whether or not [the] investigation and [the]
review of the investigation were inadequate,
Plaintiff's constitutional rights under the First
Amendment were not violated.").

Gutierrez v. Cnty. of Los Angeles, No. CV 24-7268 MCS (AS), 2024
WL 4799872, at *4 (C.D. Cal. Sept. 24, 2024) (some alterations
in Gutierrez).

Hall called 911 to report the incident with Letoto,
and HPD officers arrived at the scene. Ultimately a police
report was made, consisting of the Initial Report by Castillo
and Follow-Up Investigative reports by Koanui and Maioho. See
City Defs.' CSOF, Exh. B (HPD Report No. 19-218923). Although
Koanui's report identifies Letoto as the complainant and Hall as
the suspect in a theft offense, the report reflects that Koanui
went to the scene to "respond[] to a threatening case," and it

documents Hall's account of the incident, *i.e.*, that "LETOTO
tried to break into her house and pushed the door into her
causing the door knob [sic] to hit her in the hip resulting in
pain." See id. at C000026 (emphasis in original). Koanui's
report describes statements that Hall subsequently made that he
believed contradicted her earlier statement. See id. at C000026-
27. He ultimately generated an Injured Cared For ("ICF") number
for the incident because "HALL was in no condition to provide a
statement" because "HALL fainted for an unknown reason," and
"was resuscitated and set up in her room." See id. at C000027.
Maioho's report also documents Hall's account:

> She was claiming that her former employer tried
> to forcibly enter the house by shoving the door
> open when she was attempting to shut him out. She
> said that she felt pain from the door hitting her
> in the hip area. She was claiming that the former
> employer was also threatening her.

[Id. at C000028.]

    Hall's complaint was documented, but no action was
taken, in part because Hall fainted and the investigation could
not continue. The record is clear that Hall initially expressed
her desire to press charges against Letoto. Although the Officer
Defendants have identified some evidence suggesting that Hall
later indicated that she did not wish to pursue the matter, this
Court assumes for purposes of the City Defendants' Motion and
Koanui's Motion that she did not recant her desire to press

charges. However, because Hall does not have "a judicially
cognizable interest in the prosecution or nonprosecution of
another," see Linda R.S. v. Richard D., 410 U.S. 614, 619
(1973), the fact that no charges were brought against Letoto did
not result in a violation of Hall's First Amendment right to
petition.

Hall concedes that she did not have a right to have
criminal charges brought against Letoto. In her filings and
during the hearing on the motions Hall argued that, under
Entler, she had a First Amendment right to have a police report
filed about the alleged assault by Letoto because, without a
police report, a prosecutor would never consider the possibility
of charging Letoto with assault. See Mem. in Opp. to Koanui's
Motion at 8. In holding that "the filing of criminal complaints
falls within the embrace of the First Amendment," the Ninth
Circuit "join[ed its] two sister circuits," including the Tenth
Circuit. Entler, 872 F.3d at 1043 (citing Meyer v. Bd. of Cty.
Comm'rs, 482 F.3d 1232, 1243 (10th Cir. 2007) ("[F]iling a
criminal complaint with law enforcement officials constitutes an
exercise of the First Amendment right to petition the government
for the redress of grievances.")).

Hall relies on the following language that the Ninth
Circuit quoted from Meyer:

34

> [T]his case involves the right to present a
> criminal complaint which is a form of the right
> to petition for redress of grievances, and thus
> one of the most basic of all constitutional
> rights. In a non-precedential but persuasive
> opinion from one of our district courts
> addressing a closely analogous situation, the
> district judge said: While Plaintiff did not have
> a right to force the local prosecutor to **pursue**
> her charges, **she possessed the right to access
> judicial procedures for redress of her claimed
> wrongs and to set in motion the governmental
> machinery.**

Id. at 1043-44 (second emphasis added) (quoting Meyer, 482 F.3d
at 1243 n.5).

Entler does not stand for the proposition that every
allegation of criminal activity must be documented in a police
report and considered by a local prosecutor. "[T]he filing of a
criminal complaint . . . , as well as the threat to do so," is
only protected by the First Amendment when the complaint or
threatened complaint is "not baseless." Id. at 1043 (citing Bill
Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 743, 103 S.
Ct. 2161, 76 L. Ed. 2d 277 (1983)).

Thus, Entler does not support an unqualified First
Amendment right to have a police report filed identifying Hall
as the complainant and Letoto as a suspect in an assault
offense. Koanui and Castillo were justified in investigating her
allegation before submitting a criminal complaint. During that
investigation, Hall fainted and they were unable to complete
their investigation. In addition, the security video footage was

35

unavailable when Koanui was at the residence. See id.; see also Peng v. Mei Chin Penghu, 335 F.3d 970, 978 (9th Cir. 2003) ("This court has said that officers may not solely rely on the claim of a citizen witness that he was a victim of a crime, but must independently investigate the basis of the witness' knowledge or interview other witnesses." (citation and internal quotation marks omitted)).

Hall's position that Koanui and Castillo were required, even if their investigation was incomplete, to write a police report on Hall's behalf is based on an HPD policy and the directive from Sanchez, their superior officer. See Hall's CSOF, Exh. 13 (Honolulu Police Department Policy, Auxiliary and Technical Services, Policy Number 8.06, dated 11/1/16 ("Policy No. 8.06")) at ¶ II.A ("An on-duty officer shall prepare a numbered report each time he or she receives a complaint . . . ."); Koanui BWC at 25:40-26:44 (Koanui asks Sanchez what he should do, and Koanui acknowledges what Sanchez tells him, and states he is going to do the assault report). "Section 1983 is a mechanism for vindicating **federal** statutory or constitutional rights." Maney v. Brown, 91 F.4th 1296, 1302 (9th Cir. 2024) (emphasis added) (citation and internal quotation marks omitted). Thus, neither the alleged violation of HPD Policy No. 8.06 nor the failure to follow Sanchez's directive can support a Section 1983 claim.

36

Viewing the record in the light most favorable to Hall as the nonmoving moving party,[17] there are no genuine issues of material fact, and this Court concludes, as a matter of law, that Koanui and Castillo did not violate Hall's First Amendment right to petition the government for redress. See Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). The City Defendants' Motion and Koanui's Motion are granted insofar as summary judgment is granted in favor of Castillo and in favor of Koanui as to Claim 1. In light of the grant of summary judgment in favor of Koanui as to Claim 1, Hall's Motion is denied as to Claim 1.

## 1.    **Alternative Analysis**

Both Koanui and Castillo argue they are entitled to qualified immunity as to Claim 1.[18] See Koanui's Motion, Mem. in

---

[17] In considering the City Defendants' Motion and Koanui's Motion, this Court must view the record in the light most favorable to Hall as the nonmoving party. See Harris v. Cnty. of Orange, 17 F.4th 849, 855 (9th Cir. 2021).

[18] Claim 1 is the only Section 1983 claim as to which qualified immunity is clearly asserted in the City Defendants' Motion. Compare City Defs.' Motion, Mem. in Supp. at 11-12, with id. at 12-20. Koanui asserts qualified immunity as to all of Hall's Section 1983 claims against him. See Koanui's Motion, Mem. in Supp. at 6-12. However, this Court finds that it is only appropriate to address Koanui's qualified immunity argument as an alternate analysis as to Claim 1.

Supp. at 7-9; City Defs.' Motion, Mem. in Supp. at 11-12. In the

3/29/24 Order, this Court stated:

> Qualified immunity "shields government officials
> performing discretionary functions from liability
> for civil damages 'insofar as their conduct does
> not violate clearly established statutory or
> constitutional rights of which a reasonable
> person would have known.'" Scott v. Henrich, 39
> F.3d 912, 914 (9th Cir. 1994) (quoting Harlow v.
> Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727,
> 73 L. Ed. 2d 396 (1982)). When an officer claims
> qualified immunity, we ask "(1) whether there has
> been a violation of a constitutional right; and
> (2) whether that right was clearly established at
> the time of the officer's alleged misconduct."
> Jessop v. City of Fresno, 936 F.3d 937, 940 (9th
> Cir. 2019) (quoting Lal v. California, 746 F.3d
> 1112, 1116 (9th Cir. 2014)). Courts have
> discretion to decide which of the two prongs
> "should be addressed first in light of the
> circumstances in the particular case at hand."
> Pearson v. Callahan, 555 U.S. 223, 236, 129 S.
> Ct. 808, 172 L. Ed. 2d 565 (2009). "Addressing
> the second prong before the first is especially
> appropriate where 'a court will rather quickly
> and easily decide that there was no violation of
> clearly established law.'" Jessop, 936 F.3d at
> 940 (quoting Pearson, 555 U.S. at 239, 129 S. Ct.
> 808).

2024 WL 1348635, at *4 (quoting Saved Mag. v. Spokane Police

Dep't, 19 F.4th 1193, 1198 (9th Cir. 2021)).

Even if there were genuine issues of material fact as

to whether Hall's First Amendment right to seek government

redress was violated, summary judgment in favor of Koanui and

Castillo would be granted because the constitutional right at

issue was not clearly established at the time of the incident.

>       Law enforcement officials are entitled to
>       qualified immunity even where their conduct
>       violated a constitutional right unless that right
>       was clearly established at the time of the
>       violation. Saucier v. Katz, 533 U.S. 194, 202,
>       121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).[19] The
>       dispositive inquiry is whether "it would be clear
>       to a reasonable officer that his conduct was
>       unlawful in the situation he confronted." Id.
>       Thus, our "task is to determine whether the
>       preexisting law provided the defendants with
>       'fair warning' that their conduct was unlawful."
>       Flores [v. Morgan Hill Unified Sch. Dist.], 324
>       F.3d [1130,] 1136–37 [(9th Cir. 2003)] (quoting
>       Hope v. Pelzer, 536 U.S. 730, 740, 122 S. Ct.
>       2508, 153 L. Ed. 2d 666 (2002)).

Id. at *14 (alterations in 3/29/24 Order) (quoting Elliot-Park

v. Manglona, 592 F.3d 1003, 1008 (9th Cir. 2010)). In ruling on

the City Defendants' motion to dismiss, this Court recognized

that that a general First Amendment right to petition the

government for redress of grievances by filing a criminal

complaint was clearly established at the time of the incident.

See id. The record on summary judgment is now fully developed

regarding the circumstances of the incident and the

investigation that followed, and this Court must determine

whether there was a clearly established right to initiate a

criminal complaint by having a police report filed under those

circumstances. At the time of the incident, there was no case

---

[19] Pearson, 555 U.S. 223, overruled Saucier insofar as
Saucier held that the clearly established step is only addressed
if the court concludes there was a constitutional violation.
See, e.g., Arline v. Clark, No. 1:07-cv-01097-LJO-GSA-PC, 2010
WL 1267298, at *3 (E.D. Cal. Mar. 31, 2010).

law that clearly established a right to have a police report filed reflecting an alleged offense where the responding police officers were unable to complete their investigation.

Thus, even if summary judgment in favor of Koanui and Castillo was not granted because they did not violate Hall's First Amendment right to seek government redress, summary judgment would be granted in their favor because they are entitled to qualified immunity since the right was not clearly established under the circumstances that existed at the time of the events at issue in this case.

### 2. <u>Claim 2 – First Amendment Retaliation</u>

In Claim 2, Hall alleges that Koanui retaliated against her because of her exercise of her First Amendment rights "through a series of adverse actions, including by filing a false and misleading report against Plaintiff for theft, arresting her, and threatening to arrest her in the future if she persisted in trying to report Defendant Letoto's crimes to the police." [Third Amended Complaint at ¶ 180.] Hall alleges Castillo retaliated against her because of her exercise of her First Amendment rights because Castillo "observed much of [Koanui's] interactions with Plaintiff" and he "directly engaged in the infringement of Plaintiff's First Amendment rights. Further, Officer Castillo wrote and filed a false and misleading report against Plaintiff for theft." [<u>Id.</u> at ¶ 181.] The

40

remaining portion of Claim 2 against Maioho alleges that Maioho
retaliated against her because of her exercise of her First
Amendment rights by "not allowing her to file a criminal
complaint against Defendant Letoto, and [by writing] and
fil[ing] a false and misleading report against Plaintiff for
theft." [Id. at ¶ 182.]

> In the 3/29/24 Order, this Court stated:
>
>> The elements of a First Amendment
>> retaliation claim are:
>>
>>> "(1) [the plaintiff] engaged in
>>> constitutionally protected activity; (2) as
>>> a result, [the plaintiff] was subjected to
>>> adverse action by the defendant that would
>>> chill a person of ordinary firmness from
>>> continuing to engage in the protected
>>> activity; and (3) there was a substantial
>>> causal relationship between the
>>> constitutionally protected activity and the
>>> adverse action."
>>
>> Boquist v. Courtney, 32 F.4th 764, 775 (9th Cir.
>> 2022) (quoting Blair v. Bethel Sch. Dist., 608
>> F.3d 540, 543 (9th Cir. 2010)). Hall engaged in a
>> constitutionally protected activity by attempting
>> to file a criminal complaint against Letoto.

2024 WL 1348635, at *6 (alterations in 3/29/24 Order) (some
citations omitted). Viewing the evidence presented in the light
most favorable to Hall, this Court finds that Hall engaged in
protected activity by attempting to initiate a criminal
complaint against Letoto by having a police report filed about
the alleged assault.

a.    **The City Defendants' Motion**

When the record is viewed in the light most favorable
to Hall, Koanui's actions that Hall alleges constituted an
arrest or a threat of arrest occurred while Castillo was not in
the immediate vicinity. Thus, Castillo neither observed nor
participated in those actions.

As to Hall's claim that Castillo retaliated against
her because his HPD Report No. 19-218923 is false and
misleading, Hall argues the report was false and misleading
because of material omissions, such as the fact that Hall did
not intend to permanently deprive Letoto of the phone, and the
fact that it was returned to him at the scene. However,
Castillo's report incorporates a statement by Letoto, and that
statement includes information that Hall told Letoto she would
return the phone when she cashed her paycheck, and the fact that
the Griego returned the phone to him. See Smith Decl., Exh. K
(HPD Report No. 19-218923) at C000022 (Castillo's report,
referring to Letoto's statement); id. at C000024 (Letoto's
typewritten statement). The fact that other information could
have been included in the report, such as the fact that Koanui
was Letoto's business partner and friend, did not make the
report incomplete or incorrect where Letoto's complaint against
Hall was withdrawn. In viewing the record in the light most
favorable to Hall, the contents of Castillo's report were not

false and misleading, and Castillo's report did not constitute
an adverse action against Hall. There is no genuine issue of
material fact, and Castillo is entitled to judgment as a matter
of law as to Claim 2.

As to Hall's allegations against Maioho, when viewing
the record in the light most favorable to Hall, Maioho gave Hall
the opportunity to complete a written statement and to submit it
at a later date, but Hall never completed the statement. Hall
alleges Maioho dissuaded her from completing her statement when
Maioho advised her of her constitutional rights against self-
incrimination, but this advisory was appropriate under the
circumstances of this case given the cross-complaints between
Hall and Letoto. Maioho's advisory was neither an adverse action
in and of itself nor an act of coercion. As to Hall's allegation
that Maioho retaliated against her because her report that is
within HPD Report No. 19-218923 is false and misleading, when
viewing the record in the light most favorable to Hall, the
contents of Maioho's report are not false and misleading, for
reasons similar to those stated as to Castillo's report. See id.
at C000028 (stating Hall said she would hold on to the phone
until she cashed her paycheck and noting that the property was
later returned). Maioho's report did not constitute an adverse
action against Hall. There is no genuine issue of material fact,
and Maioho is entitled to judgment as a matter of law as to the

43

portion of Claim 2 that remained against her after the 3/29/24
Order.

    The City Defendants' Motion is therefore granted
insofar as summary judgment is granted in favor of Castillo as
to Claim 2 and in favor of Maioho as to the remaining portion of
Claim 2.

### b.   **Koanui's Motion**

    First, as to Hall's allegation that Koanui retaliated
against her by placing her under arrest, this Court notes that
an arrest or a seizure of a person "can take the form of
physical force or a show of authority that in some way restrains
the liberty of the person." Torres v. Madrid, 592 U.S. 306, 311
(2021) (brackets, citation, and internal quotation marks
omitted). "A seizure takes place 'when there is a restraint on
liberty to the degree that a reasonable person would not feel
free to leave' and 'violates the Fourth Amendment if it is
objectively unreasonable under the circumstances.'" Shen v.
Albany Unified Sch. Dist., Case No. 3:17-cv-02478-JD, 2018 WL
4053482, at *3 (N.D. Cal. Aug. 24, 2018) (quoting Doe ex rel.
Doe v. Hawaii Dep't of Educ., 334 F.3d 906, 909 (9th Cir.
2003)).[20]

---

    [20] Shen was affirmed on appeal. See Chen ex rel. Chen v.
Albany Unified Sch. Dist., 56 F.4th 708 (9th Cir. 2022).

Hall's allegation that Koanui arrested her is not
supported by the evidence. See Third Amended Complaint at ¶ 180.
Koanui never stated that Hall was under arrest nor did he state
that Hall was going to be arrested. Soon after he arrived at
Hall's residence, Koanui discussed Hall and Koanui's respective
allegations with Hall, and he told her that he wanted to ensure
that no one was going to "get unnecessarily arrested for
anything." See Koanui BWC at 4:30-4:55. He later told Hall that,
because both of the alleged offenses were misdemeanors, no one
was going to be arrested and no one was going to jail that day.
See id. at 44:18-44:26. Further, there is no evidence that
Koanui restrained Hall's liberty. He arrived at Hall's residence
in response to Hall's 911 call, she invited him to come into her
residence upon his arrival, and she led him into another room of
her residence to try to view the security camera footage. He
left Hall in the residence on two occasions, and, on the second
occasion, he told Hall that he and Castillo would wait outside
until she and Griego were done talking. See id. at 12:30-12:59;
29:04-31:20.

Hall states she "did not feel free to leave" during
her conversation with Koanui, [Second Hall Decl. at ¶ 34,] and
as noted supra, she states Koanui referred to her commission of
"'extortion' a dozen times," [Response to Koanui's CSOF at
¶ 54]. Hall also states that Koanui "used a coercive and

45

intimidating tone" when he spoke to her, [Second Hall Decl. at
¶ 27,] and he "stood in front of [her] with a wide stance and
talked authoritatively," [id. at ¶ 31]. Viewing the record in
the light most favorable to Hall, the evidence essentially
presents two conflicting stories. The United States Supreme
Court has held that, "[w]hen opposing parties tell two different
stories, one of which is blatantly contradicted by the record,
so that no reasonable jury could believe it, a court should not
adopt that version of the facts for purposes of ruling on a
motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380
(2007); see also F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d
1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving
affidavit, lacking detailed facts and any supporting evidence,
is insufficient to create a genuine issue of material fact.").
Hall's statement that she did not feel free to leave during her
conversations with Koanui is blatantly contradicted by the body-
worn camera footage so that no reasonable jury would believe
Hall's statement. This Court therefore rejects Hall's statements
suggesting that she was not free to leave.

        Hall also claims that Koanui retaliated against her
for the exercise of her First Amendment rights by threatening to
arrest her. See Second Hall Decl. at ¶ 23 (stating Koanui "made
it clear . . . that [Hall] would be arrested if [she] made a
cross complaint against Letoto"). In viewing the record in the

light most favorable to Hall, Hall's statement that Koanui
threatened to arrest her is blatantly contradicted by the body-
worn camera footage so that no reasonable jury would believe it.
This Court therefore rejects Hall's declaration regarding
Koanui's threat of arrest and finds that Koanui did not threaten
to arrest Hall.

Finally, Hall alleges that Koanui retaliated against
her because his report that is part of HPD Report No. 19-218923
is false and misleading. See Third Amended Complaint at ¶ 180.
In viewing the record in the light most favorable to Hall, the
contents of Koanui's report were not false and misleading, for
reasons similar to those stated as to Castillo's report. See
Smith Decl., Exh. K at C000028 (stating Hall told Koanui that
Letoto would get the phone back when she got her money and
noting "[a]n acquaintance on scene returned LETOTO's phone"
(emphasis in original)). Koanui's report did not constitute an
adverse action against Hall. There is no genuine issue of
material fact, and Koanui is entitled to judgment as a matter of
law as to Claim 2. Koanui's Motion is therefore granted as to
Claim 2. In light of that ruling, Hall's Motion is denied as to
Claim 2.

### 3. Claim 3 – False Arrest/Imprisonment

Claim 3 alleges Hall's Fourth Amendment rights were
violated because Koanui unlawfully arrested, detained, and/or

47

imprisoned Hall, and Castillo "both separately caused, contributed to, and failed to intervene to prevent the continued unlawful arrest, detention, and/or imprisonment of [Hall]." <u>See</u> Third Amended Complaint at ¶¶ 189-91. Because this Court has ruled that Hall was neither arrested nor threatened with arrest, Hall's Fourth Amendment claim fails as a matter of law. The City Defendants' Motion and Koanui's Motion are granted insofar as summary judgment is granted in favor of Castillo and Koanui as to Claim 3.

### 4.    **Claim 5 – Equal Protection**

In the 3/29/24 Order, this Court stated:

> The Equal Protection Clause of the Fourteenth Amendment requires that persons who are similarly situated be treated alike. <u>See</u> <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985);[21] <u>Shakur v. Schriro</u>, 514 F.3d 878, 891 (9th Cir. 2008). An equal protection claim may be established by showing that defendants intentionally discriminated against an individual based on his or her membership in a protected class. <u>See</u> <u>Comm. Concerning Cmty. Improvement v. City of Modesto</u>, 583 F.3d 690, 702-03 (9th Cir. 2009); <u>Serrano v. Francis</u>, 345 F.3d 1071, 1082 (9th Cir. 2003) . . . .
>
> An equal protection claim can also be stated by a showing that defendants intentionally treated similarly situated individuals differently without a rational relationship to a legitimate state purpose. <u>See</u> <u>Engquist v. Or. Dep't of Agric.</u>, 553 U.S. 591, 601-02 (2008); <u>Village of Willowbrook v. Olech</u>, 528 U.S. 562,

---

[21] <u>City of Cleburne</u> has been superseded by statute on other grounds. <u>See, e.g.</u>, <u>Sims v. Bird</u>, Case No. 23-CV-463 TWR(BLM), 2023 WL 3990054, at *3 (S.D. Cal. June 13, 2023).

> 564 (2000); Lazy Y Ranch Ltd. v. Behrens, 546
> F.3d 580, 592 (9th Cir. 2008).

2024 WL 1348635, at *9 (alteration in 3/29/24 Order) (some

citations omitted).

### a.    The City Defendants' Motion

Claim 5 alleges Castillo "knowingly, intentionally,

maliciously, and with reckless disregard for Plaintiff's

constitutional rights under the Fourteenth Amendment of the

Constitution of the United States filed a false and misleading

report and unlawfully interrogated and arrested Plaintiff

without probable cause." [Third Amended Complaint at ¶ 199.]

Because this Court has ruled that Castillo did not file a false

and misleading report, and he did not participate in or observe

the conduct that Hall alleges constituted her interrogation and

arrest, those portions of Claim 5 fail as a matter of law.

Hall also alleges "[t]here was no rational basis for

the disparate treatment between Plaintiff and Defendant Letoto

solely based upon Defendant Letoto's status as Defendant

Koanui's private business partner." [Third Amended Complaint at

¶ 201.] When the record is viewed in the light most favorable to

Hall, she has failed to raise a genuine issue of material fact

that Castillo treated Letoto differently from Hall during the

investigation solely because he was Koanui's business partner.

Although Castillo and Koanui did not take a statement from Hall

at the scene of the incident, there is evidence of good reasons for not doing so. Hall fainted, was evaluated by EMTs, and Koanui was unable to speak with her further. Griego suggested, and Hall did not object, that Koanui give them time to discuss whether to drop the matter. Other than the bald assertion that Letoto was treated differently because of his relationship with Koanui, Hall provides no evidence creating a genuine issue of material fact on this issue. Since there are no genuine issues of material fact as to Hall's claim that Castillo treated her differently because of Koanui's preexisting relationship with Letoto, Castillo is entitled to judgment as a matter of law as to Claim 5. The City Defendants' Motion is granted insofar as summary judgment is granted in favor of Castillo as to Claim 5.

### b.  **Koanui's Motion**

Claim 5 alleges Koanui violated Hall's Fourteenth Amendment equal protection rights by "fil[ing] a false and misleading report and unlawfully interrogat[ing] and arrest[ing] Hall] without probable cause." [Third Amended Complaint at ¶ 199.] This Court has ruled that Koanui did not arrest Hall or threaten Hall with arrest,[22] and this Court has ruled that

---

[22] Koanui's admitted that, when responding to a 911 call, he normally would have detained the suspect until the investigation was completed, but he did not detain Letoto at Hall's residence because of their preexisting relationship. See Hall CSOF at ¶¶ 33-34. Because neither Letoto nor Hall was detained during
(. . . continued)

Koanui's report within HPD Report No. 19-218923 was not false or misleading. Therefore, the portions of Claim 5 based on those allegations fail as a matter of law. Viewing the record in the light most favorable to Hall, the record does not support her allegation that Koanui unlawfully interrogated her. The incident involved Hall's allegation that Letoto assaulted her and Letoto's allegation that Hall was wrongfully withholding the Exceptional Obedience business phone. Koanui questioned Hall in connection with a police investigation as to both allegations. This Court finds that there was no unlawful interrogation, and therefore the portion of Claim 5 based upon the allegation that Koanui unlawfully interrogated Hall fails as a matter of law.

Claim 5 also alleges Koanui violated Hall's Fourteenth Amendment equal protection rights because "he did not file a report against, charge, or arrest Defendant Letoto." [Third Amended Complaint at ¶ 200.] This Court has ruled that Hall was not arrested. Because neither Hall nor Letoto was arrested, Hall cannot establish that she was treated differently from Letoto in that regard. Hall was treated differently from Letoto in that Koanui prepared a police report that named Hall as the suspect in the alleged theft, but Koanui did not prepare a police report that named Letoto as the suspect in the alleged assault.

the investigation, Koanui's admission does not support Hall's equal protection claim.

51

However, viewing the record in the light most favorable to Hall, there is a rational basis for the differential treatment – Koanui could not complete his investigation regarding the alleged assault because Hall fainted and he did not have the opportunity to speak with her after that. Maioho was to follow up with Hall when Hall recovered.

Hall has failed to raise a genuine issue of material fact as to her equal protection claim against Koanui, and he is entitled to judgment as a matter of law. Koanui's Motion is therefore granted insofar as summary judgment is granted in favor of Koanui as to Claim 5. In light of that ruling, Hall's Motion is denied as to Claim 5.

### 5.  Claim 6 – Section 1983 Conspiracy Claim

Hall argues Koanui and Letoto conspired to protect their business interests, and Castillo and Maioho agreed with them. [Plaintiff's Memorandum in Opposition to Defendant Christopher Koanui's Motion for Summary Judgment, filed 1/3/25 (dkt. no. 248), at 24-25.]

The Ninth Circuit has stated:

> Conspiracy is not itself a constitutional tort under § 1983. See Cassettari v. Nev. Cnty., 824 F.2d 735, 739 (9th Cir. 1987) ("The insufficiency of these allegations to support a section 1983 violation precludes a conspiracy claim predicated upon the same allegations."); Landrigan v. City of Warwick, 628 F.2d 736, 742 (1st Cir. 1980) ("[M]ere proof of a conspiracy is insufficient to establish a section 1983 claim.")

> (quoting Hampton v. Hanrahan, 600 F.2d 600, 622
> (7th Cir. 1979), *rev'd in part on other grounds*,
> 446 U.S. 754, 100 S. Ct. 1987, 64 L. Ed. 2d 670
> (1980)). It does not enlarge the nature of the
> claims asserted by the plaintiff, as there must
> always be an underlying constitutional
> violation. . . .

Lacey v. Maricopa Cnty., 693 F.3d 896, 935 (9th Cir. 2012) (en banc).[23] Because summary judgment has been granted in favor of the Officer Defendants as to all of Hall's Section 1983 claims, Hall cannot establish an underlying constitutional violation to support her Section 1983 conspiracy claim against them. Hall's conspiracy claim fails as a matter of law.

The City Defendants' Motion and Koanui's Motion are granted insofar as summary judgment is granted in favor of the Officer Defendants as to Claim 6.

## II.   **State Claims**

### A.   **Claim 10 — IIED**

In the 3/29/24 Order, this Court noted that, under Hawai`i law:

> [T]he tort of IIED consists of four
> elements: "1) that the act allegedly causing
> the harm was intentional or reckless,
> 2) that the act was outrageous, and 3) that
> the act caused 4) extreme emotional distress
> to another." Hac [v. Univ. of Hawai`i], 102
> Hawai`i [102,] 106–07, 73 P.3d [46,] 60–61
> [(2003)]. "The term 'outrageous' has been
> construed to mean without just cause or

---

[23] Lacey has been superseded by statute on other grounds. See, e.g., Est. of Smith v. Holslag, Case No. 16-cv-2989-WQH-MSB, 2020 WL 7863428, at *19 (S.D. Cal. Dec. 31, 2020).

excuse and beyond all bounds of decency."
Enoka v. AIG Hawai`i Ins. Co., Inc., 109
Hawai`i 537, 559 128 P.3d 850, 872 (2006)
(citations and some internal quotation marks
omitted). "The question whether the actions
of the alleged tortfeasor are unreasonable
or outrageous is for the court in the first
instance, although where reasonable people
may differ on that question it should be
left to the jury." Takaki v. Allied
Machinery Corp., 87 Hawai`i 57, 68, 951 P.2d
507, 518 (App. 1998) (quotations and
quotation marks omitted).

Young v. Allstate Ins. Co., 119 Hawai`i 403, 429,
198 P.3d 666, 692 (2008) (footnote omitted). As
to the fourth element of the claim, the supreme
court stated:

"extreme emotional distress" constitutes,
among other things, mental suffering, mental
anguish, nervous shock, and other "highly
unpleasant mental reactions." Enoka v. AIG
Hawai`i Ins. Co., Inc., 109 Hawai`i 537,
559, 128 P.3d 850, 872 (2006) (citations and
some internal quotation marks omitted).
"[M]ental distress may be found where a
reasonable [person], normally constituted,
would be unable to adequately cope with the
mental stress engendered by the
circumstances of the case." Shoppe v. Gucci
Am., Inc., 94 Hawai`i 368, 387, 14 P.3d
1049, 1068 (2000) (quoting Rodrigues v.
State, 52 Haw. 156, 173, 472 P.2d 509, 520
(1970)).

Id. at 429 n.26, 198 P.3d at 692 n.26
(alterations in Young).

3/29/24 Order, 2024 WL 1348635, at *16 (alterations in the

3/29/24 Order).

    Hall's IIED claim is based on the Officer Defendants'

alleged violations of her constitutional rights. See Third

54

Amended Complaint at ¶ 239 (alleging the Officer Defendants
"acted maliciously, knowingly, deliberately, and with reckless
disregard for the constitutional rights and wellbeing of
Plaintiff"). Because this Court has ruled that Hall's
constitutional rights were not violated, the portions of her
IIED claim based on the alleged violation of her constitutional
rights fail as a matter of law.

　　　　To the extent that Hall's IIED claim is based on
actions or omissions by the Officer Defendants other than the
alleged constitutional violations, Hall has not identified
evidence that their actions or omissions caused her to suffer
extreme emotional distress. During her deposition, Hall
testified that she told the 911 operator she was "terrified"
because her boss broke into her house and assaulted her. See
Hall's CSOF, Exh. 1 (excerpts of trans. of 11/1/24 Videotaped
Deposition of Robin Hall ("Hall Depo.")) at 144. Assuming that
this is the type of emotional distress that a reasonable person
would be unable to cope with, the emotional distress was caused
by Letoto, not by the Officer Defendants.

　　　　Hall also states that, "[f]rom the day of the
incident, [she] feared that [she] might be arrested on the theft
charge at any time, which was truly terrifying . . . ." [Second
Hall Decl. at ¶ 68.] This Court has ruled that Hall was neither
arrested nor threatened with arrest on the date of the incident.

Thus, the evidence does not support Hall's claim that, on the date of the incident, the Officer Defendants caused to fear that she might be arrested. Her fear of future arrest during the period after the incident appears to be based upon the fact that she was told on multiple occasions that she could not obtain a copy of the police report because she was the suspect and the investigation was still open. See id. at ¶¶ 59-60. The statement that the investigation was still open was incorrect because the HPD report for the incident states in multiple places that Letoto's complaint was withdrawn. See Smith Decl., Exh. K (dkt. no. 231-13, HPD Report No. 19-218923) at C000021-22. Hall has not presented any evidence suggesting that any of the Officer Defendants were responsible for the multiple times that Hall was erroneously informed the theft investigation was still open. Thus, assuming that Hall's feeling of terror at the prospect of a future arrest and her fear that a future arrest would impair her career constitutes extreme emotional distress, Hall has failed to raise a genuine issue of material fact that one or more of the Officer Defendants caused her to experience terror and fear.

Hall's interactions with the Officer Defendants on June 10, 2019 were undoubtedly unpleasant, and it can be reasonably inferred that Hall experienced distress as a result of those interactions. In ruling on the City Defendants' Motion

and Koanui's Motion, this Court "must consider all 'justifiable' and 'legitimate' inferences" in Hall's favor. See United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1545 (9th Cir. 1989) (quoting Matsushita Electric v. Zenith Radio, 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)). However, the record is insufficient to support a justifiable and legitimate inference that the distress Hall experienced as a result of her interactions with the Officer Defendants rose to the level of extreme emotional distress necessary to support an IIED claim.

    Even viewing the record in the light most favorable to Hall, there are no genuine issues of material fact, and the Officer Defendants are entitled to judgment as a matter of law as to Hall's IIED claim. The City Defendants' Motion and Koanui's Motion are therefore granted as to Claim 10.

    **B.    Claim 11 - Civil Conspiracy**

    "Civil conspiracy does not alone constitute a claim for relief." Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co., 91 Hawai`i 224, 260 n.44, 982 P.2d 853, 889 n.44 (1999) (citations omitted).[24] In other words, a plaintiff can "'bring suit for civil conspiracy only if he ha[s] been injured by an

_____

    [24] Robert's Hawaii was superseded by statute on other grounds, as recognized in Davis v. Four Seasons Hotel Ltd., 122 Hawai`i 423, 429, 228 P.3d 303, 309 (2010).

                                    57

act that was itself tortious.'" <u>Combs v. Case Bigelow &</u>
<u>Lombardi</u>, No. 28773, 2010 WL 370275, at *15 (Hawai`i Ct. App.
Jan. 27, 2010) (quoting <u>Beck v. Prupis</u>, 529 U.S. 494, 501
(2000)).

Because summary judgment has been granted in favor of
the Officer Defendants as to Hall's IIED claim, the only tort
claim alleged against them, Hall cannot establish that she was
injured by a tortious act committed by one or more of the
Officer Defendants. Hall's civil conspiracy claim therefore
fails as a matter of law. The City Defendants' Motion and
Koanui's Motion are granted insofar as summary judgment is
granted in favor of the Officer Defendants as to Claim 11.

C.    **Conditional/Qualified Privilege**

Koanui also asserts qualified immunity as to Hall's
state law claims. [Koanui's Motion, Mem. in Supp. at 23-25.]
This Court has used the term "conditional privilege" to refer to
the protection that nonjudicial government officials have under
Hawai`i law as to claims based upon tortious actions taken in
the performance of their public duty. <u>See</u> 3/29/24 Order, 2024 WL
1348635, at *15 & n.7. Maioho and Castillo also assert the
conditional privilege as to Hall's state law claims. [City
Defs.' Motion, Mem. in Supp. at 22-23.] Because summary judgment
has been granted in favor of the Officer Defendants as to both

of Hall's state law claims against them, this Court finds it is unnecessary to address their conditional privilege arguments.

<u>**CONCLUSION**</u>

For the foregoing reasons, the City Defendants' Motion for Summary Judgment, [filed 11/22/24 (dkt. no. 228),] Koanui's Motion for Summary Judgment, [filed 11/22/24 (dkt. no. 230),] and the City Defendants' joinder of simple agreement with Koanui's Motion, [filed 1/3/25 (dkt. no. 246),] are GRANTED. Summary judgment is granted in favor of Maioho, Castillo, and Koanui as to all of Hall's claims against them. Because summary judgment has been granted in favor of Koanui as to all of Hall's claims against him, Hall's Motion for Summary Judgment Against Christopher Koanui, [filed 11/22/24 (dkt. no. 232),] is DENIED.

There being no remaining claims against Maioho, Castillo, and Koanui, the Clerk's Office is DIRECTED to terminate them as parties on **March 13, 2025.**

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, February 26, 2025.



/s/ Leslie E. Kobayashi

Leslie E. Kobayashi
Senior U.S. District Judge

ROBIN HALL VS. CITY AND COUNTY OF HONOLULU, ET AL; CV 21-00248
LEK-KJM; ORDER:  GRANTING DEFENDANTS' MOTIONS FOR SUMMARY
JUDGMENT; GRANTING DEFENDANTS DEBRA MAIOHO-POHINA AND JOHN LEO
CASTILLO'S JOINDER IN DEFENDANT CHRISTOPHER KOANUI'S MOTION; AND
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST
CHRISTOPHER KOANUI